582 A.2d 824
IN THE MATTER OF THE ADOPTION OF
AMENDMENTS TO N.J.A.C. 7:27–16.

Superior Court of New Jersey
Appellate Division

Submitted October 22, 1990—Decided November 14, 1990.

336

Before Judges J.H. COLEMAN, DREIER and LANDAU.

*Pitney, Hardin, Kipp & Szuch* and the *Harker Firm*, attorney for appellant (*James A. Doyle* and *Fred Zimmerman*, house counsel, of counsel; *Robert G. Rose* and *Timothy C. Harker*, on the brief).

*Robert J. Del Tufo*, Attorney General of New Jersey, attorney for respondent (*Michael R. Clancy*, Assistant Attorney General, of counsel; *Paul H. Schneider*, Deputy Attorney General, on the brief).

The opinion of the court was delivered by

COLEMAN, J.H., P.J.A.D.

This is an appeal by the National Paint and Coatings Association, Inc. (NPACA)[1] challenging regulatory amendments promulgated by the New Jersey Department of Environmental Protection (DEP) which relate to the automobile refinishing business. The amended regulations that are being challenged are intended to reduce the automobile refinishing industry's emission of Volatile Organic Substances (VOS) into the atmosphere.

---

[1] NPACA is an industry association comprised of more than 700 companies which manufacture consumer paint products, industrial coatings and the raw materials used in those products.

Those regulations were promulgated in response to an order of the United States District Court, District of New Jersey, based on the federal Clean Air Act (Act), 42 *U.S.C.* § 7401 *et seq.* *See American Lung Ass'n of N.J. v. Kean,* 670 *F.Supp.* 1285 (D.N.J.1987), aff'd, 871 *F.*2d 319 (3d Cir.1989). We conclude that the regulations are valid.

I

One of the intended purposes of the Act is to control ozone pollution near ground level so as to "enhance the quality of the nation's air resources." 42 *U.S.C.* § 7401(b)(1), § 7470. The automotive refinishing industry has been identified by the Federal Environmental Protection Agency (EPA) as a source of ozone pollution, harmful to our nation's resources. Pursuant to the Act the EPA has promulgated ambient air quality standards defining limits on the atmospheric concentration which will be tolerated for identified pollutants. 42 *U.S.C.* § 7409(b)(1). States are required by the Act to adopt measures to reduce air pollution within the standards set by the EPA. The blueprint for such reduction is called a State Implementation Plan (SIP) which must be approved by EPA. 42 *U.S.C.* § 7410. Once approved, the state is obliged to follow its SIP. *American Lung Ass'n of N.J. v. Kean, supra,* at 1287–1288.

New Jersey's first SIP was promulgated in 1973. *Id.* at 1288. As amended in 1983, the SIP extended New Jersey's deadline for "ozone compliance" through the end of December 1987. *Ibid.* The 1983 amended SIP provided that part of New Jersey's plan to bring itself into compliance required the adoption of "extraordinary measures, including the regulation of automobile refinishing operations." It was contemplated that the automobile refinishing operations would be required to utilize either "enclosed spray booths equipped with add-on control devices, such as incinerators or absorbers," or coatings (*i.e.,* paints) that emit a low percentage of VOS while being applied to surfaces.

*American Lung Ass'n of N.J.* was filed prior to September 1987 by citizens groups claiming that New Jersey was in violation of the Act because it failed to implement the measures enumerated in its SIP. *Id.* at 1286–87. The plaintiffs contended, among other things, that the State of New Jersey failed to promulgate, adopt, and enforce regulations limiting the emission of VOS in connection with automobile refinishing. *Id.* at 1286–1287. Judge Ackerman on November 19, 1987 ordered DEP to publish its proposed regulations limiting VOS emissions by December 19, 1988 and to adopt such regulations by April 19, 1989.

On December 19, 1988, DEP published proposed regulations. 20 *N.J.R.* 3052(a). The proposed regulations required automobile refinishers to use coatings with a maximum VOS emission rate of five pounds per gallon or to achieve the equivalent results through the use of add-on pollution control devices. Those refinishing fewer than 25 vehicles per week were declared to be exempt from the regulations' requirements.

The proposed regulations were based on reports or studies prepared by: (1) EPA's Control Technology Center in October 1988 ("the EPA Report"); (2) the Radian Corporation for DEP in 1987 ("the Radian Report"); (3) the New York State Department of Environmental Conservation in August 1987; and (4) the California Air Resources Board ("CARB") in April 1982.

Publication of the proposed regulations generated substantial objections from the regulated industry, particularly from coating manufacturers. Among those submitting objections were E.I. DuPont de Nemours & Co. ("DuPont") and appellant NPACA. Public hearings were held on January 19, 1989 and January 23, 1989. Testimony was provided by representatives of the regulated industry and representatives of various citizens groups.

On June 19, 1989, DEP adopted the regulations that form the subject matter of this appeal. *N.J.A.C.* 7:27–16.5; 21 *N.J.R.* 1699(b). Those regulations differed from the proposed regula-

tions in two respects. First, instead of a requirement that all finishing coatings not exceed 5.0 pounds of VOS emissions per gallon of paint, the regulations, as adopted, required that coatings used for "base coats" not exceed 6 pounds of VOS emissions per gallon and coatings used for "clear coats" not exceed 4.4 pounds of VOS emissions per gallon of paint. All other coatings were limited to the original 5.0 pounds of VOS emissions per gallon. *Ibid.* Second, instead of exempting operators refinishing less than 25 vehicles per week, the regulations, as adopted, exempted operators using less than 50 gallons of coating per week. *N.J.A.C.* 7:27–16.5(k)(2).

## II

■ The parties to this appeal agree that the standard governing appellate review of the regulations requires us to answer three questions:

> (1) whether the agency action violates the enabling act's express or implied legislative policies; (2) whether there is substantial evidence in the record to support the findings upon which the agency based application of legislative policy; and (3) whether, in applying the legislative policies to the facts, the agency clearly erred by reaching a conclusion that could not reasonably have been made upon a showing of the relevant factors. [*Public Serv. Elec. & Gas Co. v. N.J. Dept. of Environ.*, 101 *N.J.* 95, 103, 501 *A.2d* 125 (1985) ]

Regulations are presumptively valid and the burden rests with an appellant to establish their invalidity. *Medical Society of New Jersey v. Dept. of Law & Public Safety, Div. of Consumer Affairs*, 120 *N.J.* 18, 25, 575 *A.2d* 1348 (1990); *Bergen Pines County Hosp. v. New Jersey Dept. of Human Services*, 96 *N.J.* 456, 477, 476 *A.2d* 784 (1984). However, the presumption of validity attaches only if the regulations are within the authority delegated to the promulgating agency and are not, on their face, beyond the agency's power. *Ibid.*

DEP correctly contends that its statutory power to adopt the regulations is undisputed. *N.J.S.A.* 26:2C–8 authorizes DEP to adopt regulations "preventing, controlling and prohibiting air pollution." DEP also correctly contends that there is no dispute that VOS contribute to the formation of ozone near the

ground and that ground level ozone constitutes air pollution. Finally, there is no dispute that the adopted regulations will reduce, to some extent, the amount of VOS released into the air. In contrast, NPACA has identified no legislative policy that is arguably violated by the regulations.

The main thrust of NPACA's appeal is its contention that the record does not contain substantial credible evidence to support DEP's findings that coatings which will enable the operators to comply with the regulations are available in the market place. The coatings in question consist of both the primer and the topcoat or basecoat/clearcoat (BC/CC) application. The primer coat is applied after the vehicle's exterior has been thoroughly cleaned. It provides erosion resistance, fills in surface imperfections and provides a bond for the topcoat. After the primer has dried, a topcoat is applied. The topcoat may be either solid or metallic which may be applied in one stage or in a two-stage BC/CC for improved gloss and depth.

NPACA admits that most refinishers use primers that are "either lacquer or enamel based." It also admits that the EPA's study found that the average enamel primer has an VOS emission rate of 5.1 pounds per gallon. DEP has reasoned that if the average VOS emission rate is 5.1 pounds per gallon, there are probably many primers with a VOS emission rate below 5.0 pounds per gallon. We find that it is not unreasonable for DEP to require refinishers to use these primers in light of the substantial credible evidence present in the record. *Mayflower Securities Co. v. Bureau of Securities*, 64 *N.J.* 85, 92–93, 312 *A.*2d 497 (1973).

In addition to the enamel primers that are already in wide use, water-borne and urethane primers have even lower VOS emission rates. Water-borne primers have a VOS emission rate of only 2.5 pounds per gallon. The fact that water-borne primers may be more expensive than enamel or lacquer primers, and that their use may require the purchase of some additional equipment and the application of a "pre-primer prod-

uct" does not render DEP's conclusion that they were "available" irrational. The record contains no proof that the cost of the new equipment and pre-primer product are prohibitively expensive. Beyond that, it is worth noting that the slightly higher cost and other disadvantages of water-borne primers may be offset by the several nonenvironmental advantages that those primers have over the other primers currently in use.

Urethane primers have a VOS emission rate of 4.3 pounds per gallon. The problem with the use of urethane primers is that some of them *"may ... contain isocyanate hardeners,"* which are harmful if inhaled. However, that possibility does not make them unavailable. Although urethane primers "may" contain isocyanates, it is not unreasonable for DEP to have concluded that at least some of them may not. But even if they do contain isocyanates, the dangers associated with their use can be avoided through the use of "supplied air respirators." Although many shops do not presently have such respirators available, there is no evidence that it would be prohibitively expensive for them to procure the necessary equipment. NPA-CA's contention that urethane primers "could not substitute for" the lacquer primers currently in wide use is simply not supported by the record.

■ Next we must consider the availability of the topcoats using lacquer basecoats and urethane clearcoats. DEP's original proposed regulations required both the basecoat and the clearcoat to have an emission rate of no more than 5.0 pounds of VOS emissions per gallon. However, DEP received virtually unanimous objection to that requirement because all the basecoats on the market had a VOS emission rate substantially above 5.0 pounds of VOS emissions per gallon.

The objectors also conceded that clearcoats generally had a VOS emission rate of substantially below 5.0 pounds of the emissions per gallon. For that reason, the objectors proposed that DEP require the VOS limitations of the combination of the basecoat and the clearcoat be limited to 5.0 pounds of VOS

emissions per gallon. DEP basically accepted the objectors' position by adopting final regulations that limited basecoats to a VOS content of 6.0 pounds of VOS emissions per gallon and clearcoats to 4.4 pounds of VOS emissions per gallon. *N.J.A.C.* 7:27–16.5, Table 3A. This results in a total VOS limitation for the entire system of 5.0 pounds of VOS emissions per gallon because approximately twice as much clearcoat as basecoat is used in each job. DEP chose to separately regulate each of the two steps in the process because its experience with the "averaging" approach proposed by the industry has been that it causes too many problems with enforcement.

NPACA further contends that DEP was required to adopt the averaging approach that NPACA and the industry proposed rather than regulating each of the two steps in the process. We find this contention to be unpersuasive.

First, as indicated above, NPACA essentially got what it wanted, or at least what it purported to want, from DEP. That is, refinishers will be permitted to use basecoats with relatively high VOS emission rates. Although DEP was willing to use the averaging approach to formulate its regulations, its decision not to use that approach to enforce those regulations is reasonable. NPACA does not attempt to contradict DEP's contention that averaging can cause many problems with enforcement. The suggestions made by DuPont, as to how DEP could effectively enforce regulations that permitted refinishes to adopt an averaging approach, fall far short of establishing that DEP's enforcement concerns are irrational.

NPACA's final attack on the BC/CC regulations is that there is no support for the 6.0/4.4 pound of VOS emission per gallon limitations. We also reject this contention. The 6.0 pound of VOS emission per gallon standard was directly supported by the testimony of a BASF Corporation representative to the effect that the basecoats currently on the market have an average VOS of approximately 6.0 pounds of VOS emissions per gallon. We also reject NPACA's contention that because

the *average* basecoat VOS emission rate is 6.0 pounds per gallon, there must be many basecoats with a VOS emission rate above 6.0 pounds of VOS emissions per gallon, and that therefore the regulations are invalid. As noted previously, it is rational for DEP to require refinishers to use the basecoats that pose the least danger to the environment and refrain from using those posing the greatest danger.

As to the clearcoat standard, an industry representative from DuPont and another from BASF Corporation testified that their companies can manufacture a clearcoat with a VOS emission rate of 4.5 pounds per gallon. We find it is not unreasonable for DEP to require the industry to produce a product with a VOS emission rate within 2% of this conceded capability.

Additionally, refinishers can and do use enamel or urethane basecoats which have VOS emission rates of 5.3 pounds per gallon and 5.2 pounds per gallon respectively. Although urethane basecoats are more expensive and take longer to dry than lacquer basecoats, these disadvantages are offset by other non-environmental advantages of the product.

Further, there is some indication that water-borne topcoats are available and have been used in the industry. Like urethane basecoats, they require longer drying time and are more expensive than lacquer. It is not clear, however, that they can be used in a BC/CC system, and there is no indication that they have any non-environmental advantages over other basecoat or topcoat products.

Our careful study of the record persuades us to conclude that NPACA has not met the burden of showing that there was insufficient credible evidence that coatings which conform to the regulations can be made available. At best, appellant has shown that compliance with the regulations may be expensive and might affect the ability of the refinishing industry to achieve perfect color matches in some circumstances. Undoubtedly, this achievement is of substantial value to the industry's customers. But this potential loss must be balanced

against the necessity of achieving compliance with the Act. Because nothing guarantees the industry an inexpensive product or the right to achieve a perfect color match in every case, there is no reason to invalidate the adopted regulations. *Cf. Natural Resources Defense Council v. U.S.E.P.A.*, 859 F.2d 156, 208 (D.C.Cir.1988) (discussing difference between statutory mandate to adopt regulations requiring "the best practicable technology currently available" and statutory mandate to adopt regulations requiring "any more stringent limitation ... necessary to meet water quality standards").

## III

■ NPACA further contends that DEP was required to promulgate special spot repair regulations much the same as New York has done. We disagree.

Spot repairs are those minor restoration jobs that do not require the repainting of the entire vehicle, and sometimes not even the entire damaged panel. Because only the damaged portion of the vehicle is repainted, it is especially important to achieve a close color match. If the color match is not nearly perfect, the entire panel, and possibly the entire side of the vehicle, must be repainted, at greater economic cost and at greater cost to the environment due to the amount of VOS released through the application of the additional paint. According to the industry, the only type of coating that allows a perfect color match is lacquer, which typically has a VOS emission rate above 6.0 pounds per gallon. Lacquer can be used to achieve a perfect match because it possesses properties that allow it to be sprayed, dried, and resprayed in order to achieve progressively closer color matches. NPACA further asserts that if a car was originally painted with lacquer, as many still on the road were, it must be repainted with lacquer or the repainted section will have a texture different from that of the original sections.

New York has set a VOS emission limit of 6.2 pounds per gallon for spot repairs even though its limit for other coatings is 5.0 pounds of VOS emissions per gallon. The industry almost unanimously sought adoption of similar regulations in New Jersey. We are satisfied that New Jersey is not required to follow New York's lead. DEP's written response to public comments makes clear that New Jersey's rules are not identical to New York's.

Although the record indicates that lacquers are the coating that will most easily achieve the best color match, the record also indicates that enamels, with their significantly lower VOS emission rate can also achieve a reasonably close color match through the use of blending. Blending is the light application of the repair color over neighboring areas and/or panels. It allows the casual observer to overlook any slight differences in color.

Beyond that, if an automobile owner does desire the kind of perfection that can be achieved only through the use of lacquers, that customer can utilize the services of a refinisher that uses the expensive add-on pollution controls that the regulations permit.

## IV

NPACA also contends that DEP failed to provide notice and an opportunity to comment on the regulations limiting the VOS emission rates of basecoats to 6.0 pounds of VOS emissions per gallon and of clear coats to 4.4 pounds of VOS emissions per gallon. As noted previously, the regulation as originally proposed limited all refinishing coatings to a VOS emission rate of 5.0 pounds per gallon.

*N.J.A.C.* 1:30–4.3 requires an agency to provide new notice and a new opportunity to comment when the changes the agency makes in proposed regulations are "so substantial that the changes effectively destroy the value of the original notice." *Ibid.* Here, NPACA is hardly in a position to argue that

the changes effectively destroy the value of the original notice. Indeed, the changes are favorable to NPACA and they were made in response to NPACA's position as an objector to the originally proposed regulations. *See Matter of Adoption of Regulations Governing Organic Substances in Consumer Products, N.J.A.C. 7:27–23,* 239 *N.J.Super.* 407, 571 *A.*2d 971 (App.Div.1990). Clearly as to NPACA, the value of the original notice was not destroyed. Hence, we find this contention to be clearly without merit.

V

■ NPACA contends still further that the regulations should be invalidated because of DEP's erroneous estimation of the beneficial impact. DEP responds that the estimation was not erroneous. This contention evolves around the estimated reduction of VOS emissions per year that will be achieved by the regulations. DEP stated in the introduction to the proposed regulations that VOS emissions would be reduced by 550 tons per year. NPACA contends the reduction will be only 193 tons per year. DEP has failed to point to any basis in the record for arriving at the estimated 550 tons per year.

We are persuaded that NPACA is correct in its assertion that the VOS emission will be reduced by only 193 tons per year under the regulations as amended. The Radian Report prepared in 1987 for DEP formed the basis for DEP's decision regarding which refinishers would be bound by the regulations. The regulations apply to only those larger shops which use 50 gallons or more of coatings per week. *N.J.A.C.* 7:27–16.5(k)(2). The Radian Report states that the larger shops covered by the regulations generate 485 tons of VOS emissions per year. Because the regulations do not eliminate emissions from this category of pollutants, but instead, only reduce those emissions from 8.4 pounds per gallon to 5.0 pounds per gallon, *i.e.* about 40%, the total annual reduction achieved through the implemen-

tation of the regulations will be about 40% of 485 tons per year, or a total of 193 tons per year.

Although we are persuaded that the regulations will not achieve the reduction in VOS emissions contemplated by DEP, this is not sufficient to invalidate the adopted regulations. DEP expressly disclaimed any reliance upon a cost benefit analysis when exercising its rule making authority. To be sure, DEP was aware that the regulations may not reduce the VOS emissions by 550 tons per year before it enacted the regulations.

While we recognize that compliance will be costly, the environmental increment from these regulations will be added to other achievements under the Act. Viewed in that light, reduction in VOS emissions by 193 tons per year is not insignificant. The record indicates that 286 shops will be required to comply with the regulations at a cost of between $15,000 and $30,000 per shop. Even though the initial cost may be substantial, the benefit will be achieved over many years and the cost amortized accordingly. Additionally, (1) the substantial health risks caused by continued VOS emissions; (2) the $5 billion annual nationwide crop loss caused by VOS emissions; and (3) the as yet unestimated cost of the damage to rubber and plastic products caused by VOS emissions, buttress the conclusion that the expenditure is not unreasonable.

We also reject NPACA's argument that the regulations are unreasonable because they do not apply to smaller shops. The shops covered by the regulations represent 13% of the refinishing shops in the State which conduct 37% of the business in the State. DEP is free to "undertake resolution of problems one step at a time, addressing itself to the part of the problem that seems most acute." *Board of Ed. of Piscataway Tp. v. Caffiero*, 86 *N.J.* 308, 324, 431 *A.*2d 799 (1981), app. dism, 454 *U.S.* 1025, 102 *S.Ct.* 560, 70 *L.Ed.*2d 470 (1981) (citation omitted). It is highly reasonable and desirable for DEP to

begin to resolve the problem of VOS emissions from the automobile refinishing industry by first regulating the larger shops.

We have considered the remaining contentions raised and find that they are clearly without merit. *R.* 2:11–3(e)(1)(D). We affirm the adoption of those portions of *N.J.A.C.* 7:27–16 which apply to the automobile refinishing industry. In all respects, they satisfy the requirements of *Public Serv. Elec. & Gas Co. v. N.J. Dept. of Eviron., supra.*

Affirmed.