920 A.2d 111 (2007)
392 N.J. Super. 117
In re ADOPTION OF AMENDMENTS AND NEW REGULATIONS AT N.J.A.C. 7:27-27.1, -27.2, -27.4, -27.5, -27.6, -27.7, -27.8, -27.9 and -27.11, and N.J.A.C. 7:27A-3.10.
In re Control and Prohibition of Mercury Emissions (Adopted Amendments of N.J.A.C. 7:27-27.1, -27.2, -27.4, -27.9 and 7:27A-3.10, and New Rules N.J.A.C. 27.5, 27.6, 27.7, and 27.8).
Superior Court of New Jersey, Appellate Division.
Argued March 14, 2007.
Decided April 13, 2007.
*113 Marty M. Judge, Princeton, argued the cause for appellant Gerdau AmeriSteel in A-2445-04T2 (Drinker Biddle & Reath, attorneys; Mr. Judge, of counsel and on the brief).
Joseph J. Green (Kelley Drye Collier Shannon) of the Virginia and District of Columbia bars, admitted pro hac vice, Washington, DC, Arlington, VA, argued the cause for appellant Steel Manufacturers Association in A-2476-04T2 (Kirkpatrick & Lockhart Nicholson Graham and John L. Wittenborn, Washington, DC (Kelley Drye Collier Shannon) of the District of Columbia, Indiana and Ohio bars, admitted pro hac vice, attorneys; Brian S. Montag, Newark, of counsel; Mr. Wittengorn, of counsel and on the brief).
Howard Geduldig, Deputy Attorney General, argued the cause for respondent NJDEP in both appeals (Stuart Rabner, *114 Attorney General of New Jersey, attorney; Michael J. Haas, Assistant Attorney General, of counsel; Mr. Geduldig, on the brief).
Before Judges LEFELT, PARRILLO and SAPP-PETERSON.
The opinion of the court was delivered by
PARRILLO, J.A.D.
On November 4, 2004, the New Jersey Department of Environmental Protection (DEP) issued the first regulations ever to control mercury emissions from iron and steel melters. The only prior controls on mercury emissions were in the melters' operating permits, which are specific to each facility and widely different. Moreover, none of the iron and steel facilities in New Jersey is currently covered by federal regulation. The new rules require a 75% reduction in mercury emissions starting in 2010, achieved through source separation measures and, if necessary, installation of additional exhaust controls. These rules, which exceed federal requirements, affect electric arc furnace steel manufacturers who are members of appellant Steel Manufacturers Association (SMA), including appellant Gerdau AmeriSteel, who owns and operates two mini-mills in New Jersey that utilize electric arc furnaces to recycle scrap metal to produce new steel products. Appellants support source separation, but object to the mandatory installation of additional exhaust controls should source separation measures fail to achieve the DEP's reduction goals. Consequently, in these consolidated appeals, they challenge the newly promulgated regulations on a variety of grounds, arguing, among other things, that DEP exceeded its statutory authority; acted arbitrarily, unreasonably and without a legitimate technical basis by requiring use of emission control technologies that are neither commercially available nor of proven effectiveness for the forms of mercury generated by the mini-mills; and violated the rulemaking requirements of the Administrative Procedure Act (APA), N.J.S.A. 52:14B-23.
By way of background, the record discloses that there are six "melters" or "mini-mills" in New Jersey, which are facilities that turn mercury-containing scrap metal into iron or steel. Three of them, including the two operated by Gerdau, utilize electric arc furnaces (EAF) to recycle or melt the scrap metal, and the other three use a vertical furnace called a cupolo. Collectively, their permitted production capacity is approximately three million tons per year. Together, they constitute the State's largest single "source category" for atmospheric emissions of mercury, and DEP estimates that they discharge about 1000 pounds of mercury per year as a byproduct of the melting process, even after treatment by some form of emission-control technology.
Mercury is a heavy metal which is regulated because it is a "hazardous air pollutant" (HAP) under both federal and state law. 42 U.S.C.A. § 7412(b); N.J.S.A. 26:2C-2. Mercury has high toxicity and a tendency to persist in the environment and become concentrated in food sources, particularly fish. In fact, mercury has far greater toxicity compared to the air pollution "criteria pollutants." 36 N.J.R. 5412, response to comment 31. Inorganic mercury is commonly released to the environment by burning fuels and wastes containing mercury. The likely source of mercury in New Jersey is from "feedstock ferrous scrap", which includes recycled motor vehicles, home appliances, and waste metal from demolished buildings. More specifically, the mercury in switches, sensors and thermostats that those items contain is the likely source of the mercury in a melter's exhaust. *115
To date, only a modest proportion of the reduction in mercury emissions by melters has been achieved through source separation, namely, having scrap dealers and recyclers, which supply mini-mills with the end-of-life vehicles that are the largest source of their feedstock, remove electrical switches that contain mercury from the vehicles before processing them. To be truly effective, source separation has to occur before scrap is processed for delivery to the mini-mill, because the receipt of scrap in bulk quantities prohibits a mini-mill from identifying and removing the "relatively minute quantities of mercury-containing components". Yet, the regional scrap metal industry, which has been largely unregulated in New Jersey, has very little incentive to comply. Devices such as switches, sensors and thermostats simply do not have enough intrinsic value for dismantlers or recyclers to remove them before processing, so even if the use of mercury in new devices were phased out, the old ones would continue to appear in the feedstock for years to come. In addition, scrap processors sometimes lack necessary information from vehicle manufacturers about the exact location of those devices. As a representative for one of the melters, United States Pipe and Foundry[1], testified at public hearings on DEP's proposed regulations at issue here, his company spent more than a year demanding mercury-free scrap from its eleven suppliers and offering "an incentive," but only one of them even tried to remove switches containing mercury. According to the representative, in the currently tight market for scrap metal, "if you can get it anywhere, even from overseas, you need to try to get it or you don't operate". Thus, while source removal may be a reasonable and cost-effective emissions control measure  DEP having estimated the cost of switch removal at $2 per switch, or $1140 per pound of mercury removed  DEP also concluded from the results of a pilot project demonstrating only a 50% reduction, that such an approach by itself "will not necessarily" achieve a sufficient reduction in mercury emission. 36 N.J.R. 5413-14, response to comment 34; 36 N.J.R. 5411, response to comment 25.
In addition to source removal, four of the six melters in New Jersey (three EAFs and the one cupola), including Gerdau's facilities in Raritan and Sayreville, use an emission control technology called a "baghouse," which is essentially a fabric filter. However, in one melter's operations, the baghouse reduced mercury emissions by only 34%. In fact, recent stack test data show that the mean mercury emission rate from iron and steel melters, weighted based on production capacity, was 137 milligrams of mercury emissions per ton (mg/ton) of iron or steel production, an emissions rate deemed by DEP to be causing an unacceptable degree of human exposure to mercury.
Because of the threat to the public health and welfare posed by the inadequacy of then current mercury pollution policies, DEP established the New Jersey Mercury Task Force (Task Force) on March 9, 1998. Its charge was to "review innovative and low cost emission reduction strategies available in various industrial sectors", and to "[r]ecommend mercury emission controls and standards for in-state sources."
In carrying out its duties, the Task Force looked to mercury control technologies in related industries, particularly coal power plants and municipal solid waste (MSW) incinerators, as well as European mini-mills. To be sure, there were differences: the levels of mercury in the melter's *116 scrap feed were highly variable and unpredictable compared to the far less variable levels in coal plants due to the homogenous nature of their fuel supplies. There were also differences in the balance or "speciation" between ionic and elemental forms of mercury in the source material in the exhaust stream as well as the temperatures of the exhaust or "flue gases." Indeed, DEP agreed that elemental mercury might represent "a relatively large portion" of a mini-mill's mercury emissions and that ionic forms of mercury are easier to capture than the elemental mercury that predominates in melting operations. Despite these differences in characteristics, however, studies assessing the prospects for adapting the mercury control techniques used in other industries concluded that the technology is readily transferable.
On November 30, 2000, the consulting firm of BE & K Terranext issued a report analyzing the "best available control technology" and the "state of the art" (SOTA) for reducing mercury emissions from a mini-mill. Terranext noted the "potentially applicable" technology of injecting activated carbon into the melters' exhaust gas streams, which MSW incinerators were doing and which coal power-plants were testing.[2] In fact, one company, ADA Environmental Technology, advised Terranext that its experience relating to coal power-plants "is expected to be similar to what may be encountered in the steel industry". ADA accordingly assumed that a baghouse would collect "essentially 100% of the mercury associated with particulate matter," and that "[t]he relatively low temperature of 200°F should lend itself to effective capture of vapor phase mercury by carbon based sorbents". The only variable, depending on the mercury vapor's speciation, was the amount of carbon-based sorbent that would have to be injected to capture 90% of total mercury vapor.
The Task Force agreed that activated carbon injection (ACI) technology is commercially available, having been used for well over a decade by operators of MSW incinerators to significantly reduce mercury emissions, and that this technology was readily transferable to New Jersey's iron and steel melters, particularly those that already have baghouses for control of particulate emissions melters. Thus, recognizing that source reduction measures alone may not fully achieve the Task Force's mercury emission reduction goals of 75%, the Task Force issued Volume I of its Report in December 2001, recommending a cooperative three-year effort "to reduce mercury contamination of scrap through elimination and separation measures," followed by the mandatory installation of exhaust controls if the source-separation measures by themselves did not achieve the Task Force's emission-reduction goal of 75%. In Volume III, issued in January 2002, the Task Force, obviously impressed by the 95% reduction of exhaust mercury levels for MSW incinerators, and finding that both the volume of a melter's flue gas flow and the concentrations of mercury in it were not outside the range for MSW incinerators or coal power-plants, concluded that, for the three EAFs and the one cupola already using a baghouse, the amount of carbon injection needed for additional reductions to achieve compliance would be "a relatively low capital cost option". The two cupolas that used scrubbers "would need to rely on scrap management or evaluate measures to remove mercury switches," or develop *117 another way to oxidize the mercury vapor into an ionic form before it enters the scrubber.
Subsequent studies confirmed this view. A February 27, 2004 EPA report about mercury-control technology for coal power-plants described how the mercury, which "in the high temperature regions of" the boilers becomes elemental vapor, "begins to convert" to ionic or other non-elemental forms, and then turns solid or gets "absorbed onto the surface of other particles". The report related a "very limited set of short-term full scale trials" of activated carbon injection for power-plants using subbituminous or lignite coal, and noted that such injection, in conjunction with an electrostatic precipitator, "has the potential to achieve" a 70% reduction, or even 90% if a fabric filter is also used.
Along similar lines, a March 11, 2002 DEP memo explained that the mercury vapor at the U.S. Pipe and Foundry facility was three-quarters elemental at the baghouse inlets, where the temperature averaged 718°F. However, at the baghouse outlets, where the average temperature was 170°F, only three-eighths of the mercury vapor was elemental, meaning that half of the elemental mercury had changed to ionic, which DEP presumed was "likely related in part" to the temperature change.
A subsequent DEP memo, dated June 10, 2003, acknowledged that source separation could reduce emissions "to a level in the range of 35 mg" per ton, but only if it resulted in feedstock that was entirely free of mercury. Accordingly, the memo recommended that New Jersey's four facilities with baghouses (which included Gerdau's in Sayreville and Raritan) might have to achieve further reductions by injecting activated carbon into their exhaust gas stream. The memo also referred to other injectable sorbents, including "oxidized hydrated lime and inexpensive silicate substrates impregnated with chemicals that possess a strong affinity for mercury," which, in addition to activated carbon, were being used in the MSW incinerators and tested at coal power-plants. The memo stated that "amended silicates" were "projected to be commercially available within 1 year with lower price[s] than" activated carbon. It also alluded to some success in Europe with the injection of sodium tetrasulfide, either alone or in addition to activated carbon. The memo recommended that melters be given three years to achieve the Task Force's emission-reduction standard of 75% or 35 mg per ton through source separation, with another two years to meet the standard by whatever means necessary.
The regulations at issue, proposed on January 5, 2004, adopted and incorporated these findings. They set stringent limits on mercury emissions from four classes of industrial sources, including iron and steel melters,[3] with different standards for each "based on an independent evaluation of the source characteristics and mercury control methods that exists for each source category." 36 N.J.R. 123. With regard to melters, the proposed rule required either a mercury emissions cap of 35.0 mg/ton or alternatively, a 75% reduction of mercury in the flue gas by a pollution control apparatus. 36 N.J.R. 126; 36 N.J.R. 138; N.J.A.C. 7:27-27.6(a). These limits would be enforceable in five years, i.e., January 3, 2010. N.J.A.C. 7:2 7-27.6(a). Moreover, "if source separation does not succeed in achieving" that level, the regulation *118 would require a melter "to install mercury control technology" in order to "reduce its mercury emissions by at least 75 percent as measured at the exit of the mercury control apparatus." 36 N.J.R. 126.[4]
However, in the interim five years, DEP expected that strategies would be developed to remove mercury from scrap, permitting compliance with the 75% reduction or 35.0 mg/ton limits without the need for facility operators to install additional air pollution controls. 36 N.J.R. 5412. To this end, the proposed regulations would require "work practice standards for iron or steel melters similar to the recently adopted Federal MACT [maximum achievable control technology] rules applicable to iron and steel industry,"[5] namely, a "certified mercury minimization or source separation plan" that includes a program to purchase and use only mercury-free scrap and a plan for inspecting incoming scrap to assure that it is mercury-free. 36 N.J.R. 129, 132, 139. Compliance with those standards would not impose any costs on melters beyond what they must incur under the MACT rules that "already require these procedures." 36 N.J.R. 129.
Moreover, consistent with the recommendations of the Task Force, the Mercury Switch Removal Act of 2005 (MSRA), N.J.S.A. 13:1E-99.82 to -99.90, was enacted on March 24, 2005, requiring those providing end-of-life vehicles (EOLVs) to scrap recycling facilities, or scrap recycling facilities prior to crushing or shredding EOLVs, to remove all EOLV mercury switches. N.J.S.A. 13E:1E-99.87. Under the MSRA, automobile manufacturers are required to provide reimbursement for mercury switch removal, N.J.S.A. 13E:1E-99.85f, which DEP had estimated to be $2 per switch, or $1140 per pound of mercury so removed. 36 N.J.R. 129. Thus, given implementation of the MSRA and similar programs mandated by the regulations, DEP believed it increasingly feasible for iron and steel melters to restrict their charge solely to mercury-free scrap.
In the event, however, that source separation alone did not meet the regulatory standard, 36 N.J.R. 5413-14, response to comment 34; 36 N.J.R. 5411, response to comment 25, operators would be required under the mercury rules to install mercury control technology. 36 N.J.R. 126. Here again, DEP's expectation was that the four melter facilities in New Jersey that use baghouses "can comply with the standard by injecting powdered activated carbon (PAC) if source separation alone does not reduce mercury emissions to the new limit." 36 N.J.R. 129. The two facilities with scrubbers could use the same control technology, or they might "add chemicals such as sodium hypochlorite to their scrubbing solution to remove mercury from the gas stream." Ibid.
*119 In further clarification, in response to industry's comments published after the November 4, 2004 adoption of the regulations as proposed, DEP explained why no characteristic of melters' operations, not even the variability in the amount of mercury or the proportion of elemental to ionic mercury in the source material, weakened the prospect of successfully adapting these control technologies to their operations, especially when DEP was conservatively requiring only a 75% reduction rather than the 90% already shown to be attainable:
Activated carbon injection (ACI) is a technology that is commercially available today, based on experience with MSW incinerators using ACI. Activated carbon effectively controls both ionic and elemental mercury.
Three of the five MSW incinerators in New Jersey were built with fabric filters. After those facilities were retrofitted with ACI, they achieved well over 90 percent mercury emission reduction, with two of the three achieving 99 percent with higher carbon injection rates than the third.
The Department believes that the experience in the MSW sector can be applied to iron and steel melters, and understands that the ACI technology has already been successfully applied to iron and steel melters in Europe. Even assuming that the proportion of mercury at the MSW facilities is 90 percent ionic and 10 percent elemental, to achieve 99 percent overall control, those facilities must be controlling elemental mercury by at least 90 percent. These reductions have been achieved even with greatly variable fuel entering the MSW incinerators.
Furthermore, more recent studies in the United States have shown that powdered ACI used with [an electrostatic precipitator and a baghouse] has been very effective in controlling emissions of elemental mercury. ADA-ES, Inc., a vendor of air pollution controls, has demonstrated that this technology has reduced elemental emissions from bituminous coal-fired powered plants by more than 99 percent, while also removing more than 85 percent of ionic mercury.
. . . .
[United States Department of Energy reports] show that with the appropriate level of carbon injection, mercury removal with this technology exceeds 90 percent. An even more recent study has shown that power plants burning subbituminous coal, which yields a much higher proportion of elemental mercury than bituminous coal, have achieved mercury removal rates at or near 90 percent.
The fundamentals of ACI technology are essentially the same in different types of facilities. In an MSW incinerator, in a coal-fired boiler, or in an iron and steel melter, ACI involves injecting carbon into the flue gas, where mercury adsorbs to the carbon and is captured in a particulate control device. MSW incinerators have used the technology successfully for more than a decade, and the USDOE has demonstrated that coal-fired boilers can also use the same technology successfully. The Department has not identified any circumstances specific to iron and steel melters that would indicate that such facilities could not use the same technology. However, by promulgating a 75 percent removal standard for iron and steel melters, which is significantly lower than the 90 percent or more that other types of facilities have achieved with ACI, the Department has sought to accommodate possible (but unproven) differences in *120 the effectiveness of ACI in iron and steel melters.
[36 N.J.R. 5411, response to comment 26 (citations to studies omitted).]
DEP justified inclusion of the alternative performance standards on the basis of the "adverse health effects caused by consuming mercury contaminated fish, and the existence of technology at a reasonable cost"[6] to provide any additional reduction that is needed beyond what source separation proves to afford. 36 N.J.R. 133. Moreover, the alternative standard of a 75% reduction in mercury emissions was recommended by the Task Force, and was actually equivalent to a limit of 34 mg per ton when applied to the production capacity of the six melters in the State. 36 N.J.R. 5411, response to comment 27. Indeed, DEP deemed the 75% figure "conservative" for being significantly lower than the reduction of "over 90 percent" that it believed the record showed to be achievable by melters through the application of existing technology. 36 N.J.R. 5412, response to comment 27.
Thus, DEP determined that a "transfer" of the MSW industry's three approaches of "pollution prevention, source separation, and air pollution control technology is clearly feasible for iron and steel manufacturers[,]" 36 N.J.R. 5413, response to comment 34, especially given the five-year window of implementation. And the potential costs were reasonable in light of the benefits of reducing mercury emissions and bioaccumulation, and of the far greater toxicity of mercury compared to the air pollution "criteria pollutants." 36 N.J.R. 5412, response to comment 31. Indeed, both the "total capital cost and annual operating costs" of achieving the reduction were comparable to those for controlling certain other air pollutants such as particulate matter. Ibid.

(i)
On appeal, appellants' principal contention is that DEP overstepped its authority by issuing air-pollution regulations that impose stricter requirements than federal standards, in violation of a state statute that expressly incorporated those standards as the maximum that DEP could impose. Appellants argue that federal law requires only "major sources" of mercury to use Maximum Achievable Control Technology (MACT), that federal law lists EAFs in the lesser category of "area sources," and that N.J.S.A. 26:2C-9.2c(2)(a), the statute governing operating permits, requires emission standards for area sources to be based on "reasonably available control technology." We hold that DEP was well within its authority under N.J.S.A. 26:2C-8 to issue these regulations and that the provisions of N.J.S.A. 26:2C-9.2 do not limit the exercise of that authority.
The interpretation of a statute begins with its plain language, which is to be given its ordinary meaning as long as there is no indication that the Legislature had a different intent. Koch v. Dir., Div. of Taxation, 157 N.J. 1, 7, 722 A.2d 918 (1999); Merin v. Maglaki, 126 N.J. 430, 434-35, 599 A.2d 1256 (1992). Our courts defer to the interpretation of the agency charged with the statute's enforcement, Koch, supra, 157 N.J. at 8, 722 A.2d 918; Smith v. Dir., Div. of Taxation, 108 N.J. 19, 25, 527 A.2d 843 (1987), and it will *121 prevail "as long as it is not plainly unreasonable." Koch, supra, 157 N.J. at 8, 722 A.2d 918 (quoting Metromedia, Inc. v. Dir., Div. of Taxation, 97 N.J. 313, 327, 478 A.2d 742 (1984)).
Regulations that "come within the ambit of delegated authority" are presumed to be reasonable unless the party challenging them shows them to be "arbitrary, capricious, unduly onerous or otherwise unreasonable." N.J. Guild of Hearing Aid Dispensers v. Long, 75 N.J. 544, 561, 384 A.2d 795 (1978); accord In re Freshwater Wetlands Prot. Act Rules, 180 N.J. 415, 430-31, 852 A.2d 167 (2004). However, "an administrative agency may not, under the guise of interpretation, extend a statute to give it a greater effect than its language permits," so "regulations that flout the statutory language and undermine the intent of the Legislature" are invalid. GE Solid State, Inc. v. Dir., Div. of Taxation, 132 N.J. 298, 306-07, 625 A.2d 468 (1993) (citations omitted). The interpretation of regulations follows the principles of statutory interpretation. See State v. Hessen, 145 N.J. 441, 456, 678 A.2d 1082 (1996) ("The same understanding of the principles of statutory construction apply to the interpretation of court regulations.").
The "mercury rules" at issue are sustainable under DEP's broad authority to issue health-based regulations under N.J.S.A. 26:2C-8. See Dep't of Health v. Owens-Corning Fiberglas Corp., 100 N.J.Super. 366, 393-94, 242 A.2d 21 (App. Div.1968), aff'd o.b., 53 N.J. 248, 250 A.2d 11 (1969), ("[I]t is not unreasonable for the State, in the interest of the public health and welfare, to seek to control air pollution," and that, "[e]ven if this means the shutting down of an operation harmful to health or unreasonably interfering with life or property, the statute must prevail."). Contrary to appellants' assertion, DEP did rely on a health-based justification for these regulations, because the 75% reduction standard was based on Task Force reports that included a health analysis, and used it to recommend the maximum reduction in mercury emissions that melters could actually attain. Moreover, N.J.S.A. 26:2C-8 does not reference the N.J.S.A. 26:2C-9.2 limitations on the performance standards that it may impose in an operating permit. Quite the opposite, the accommodation provision of N.J.S.A. 26:2C-9.2c(2)(c), which appellants themselves claim to be applicable, expressly states that the facility would have to show compliance with "any other applicable State or federal standard, code, rule, or regulation[,]" N.J.S.A. 26:2C-9.2c(2)(c), and clearly allows for no exception to this requirement. We discern no conflict between N.J.S.A. 26:2C-8 and the operating permit statute, N.J.S.A. 26:2C-9.2, and DEP was well within its discretion to reconcile these provisions as it did. Cf. In re Adoption of Amends. to N.J.A.C. 7:27-16, 244 N.J.Super. 334, 340-45, 582 A.2d 824 (App.Div.1990) (no mention of N.J.S.A. 26:2C-9.2 in industry association's challenge to regulations issued under N.J.S.A. 26:2C-8 about emissions of volatile organic substances by auto refinishing businesses).

(ii)
Appellants next argue that the regulations are arbitrary and unreasonable, setting a performance standard that is "aspirational" rather than technology-based, and solely on speculation that the necessary control technology is available. Specifically, they contend that the record fails to support DEP's conclusion that the control technology used in MSW incinerators and coal power-plants can effectively reduce mercury emissions from melting operations and that DEP ignored critical differences in variability of mercury content, *122 speciation and temperature. We disagree.
In determining whether an agency's exercise of rulemaking was arbitrary or unreasonable, our courts require an assessment of "whether there is substantial evidence in the record to support the findings upon which the agency based" its actions. Pub. Serv. Elec. and Gas Co. v. N.J. Dep't of Envtl. Prot., 101 N.J. 95, 103, 501 A.2d 125 (1985). As long as the agency acted within the scope of its statutory authority, "`[f]acts sufficient to justify the regulation must be presumed,'" and the burden "`is not upon the Commissioner to establish that the requisite facts exist,'" but rather "`on the petitioners to establish that they do not.'" In re Adoption of N.J.A.C. 10:52-5.14(d)2 & 3, 276 N.J.Super. 568, 575, 648 A.2d 509 (App.Div.1994) (quoting Consolidation Coal Co. v. Kandle, 105 N.J.Super. 104, 114, 251 A.2d 295 (App.Div.), aff'd o.b., 54 N.J. 11, 252 A.2d 403 (1969)) (alteration in original), certif. denied, 142 N.J. 448, 663 A.2d 1355 (1995).
The agency's factual findings enjoy a presumption of correctness as long as they are supported by "sufficient credible evidence in the record as a whole." Bd. of Educ. of Englewood Cliffs v. Bd. of Educ. of Englewood, 257 N.J.Super. 413, 456-57, 608 A.2d 914 (App.Div.1992), aff'd o.b., 132 N.J. 327, 625 A.2d 483, cert. denied, 510 U.S. 991, 114 S.Ct. 547, 126 L.Ed.2d 449 (1993). Accord Dennery v. Bd. of Educ. of Passaic County, 131 N.J. 626, 641, 622 A.2d 858 (1993); Clowes v. Terminix Int'l, 109 N.J. 575, 587, 538 A.2d 794 (1988). An appellate court applies these standards in order to avoid substituting its own judgment for the agency's exercise of expertise. In re Distribution of Liquid Assets, 168 N.J. 1, 10, 773 A.2d 6 (2001); In re Authorization for Freshwater Wetlands Gen. Permits, 372 N.J.Super. 578, 593, 860 A.2d 450 (App.Div.2004).
When the record would support two distinct courses of action, the agency's choice of one over the other will not be deemed arbitrary or capricious as long as it was reached "honestly and upon due consideration, even though it may be believed that an erroneous conclusion has been reached." Worthington v. Fauver, 88 N.J. 183, 204-05, 440 A.2d 1128 (1982) (quoting Bayshore Sewerage Co. v. Dep't of Envtl. Prot., 122 N.J.Super. 184, 199, 299 A.2d 751 (Ch.Div.1973) (declaring such agency action "not arbitrary or capricious"), aff'd o.b., 131 N.J.Super. 37, 328 A.2d 246 (App.Div.1974)). Due consideration requires that DEP have a "scientific justification" for its choice, as opposed to relying on "`no more than a regulatory guess.'" In re Protest of Coastal Permit Program Rules, 354 N.J.Super. 293, 348-49, 807 A.2d 198 (App.Div.2002) (quoting N.J. Chapter of Nat'l Ass'n of Indus. & Office Parks v. N.J. Dep't of Envtl. Prot., 241 N.J.Super. 145, 163, 574 A.2d 514 (App.Div.), certif. denied, 122 N.J. 374, 585 A.2d 379 (1990)). A successful challenge to the regulations implementing the agency's chosen course will require more than just a showing "that compliance with the regulations may be expensive." In re Adoption of Amends. to N.J.A.C. 7:27-16, supra, 244 N.J.Super. at 344-45, 582 A.2d 824. By the same token, "[a]n achievable standard need not be one already routinely achieved in the industry," although it must be achievable "on a regular basis." Nat'l Lime Ass'n v. EPA, 627 F.2d 416, 431 n. 46 (D.C.Cir.1980).
The National Lime court remanded not for want of an actual demonstration of effectiveness in the industry being regulated, but because EPA failed "to consider the representativeness along various relevant parameters of the data relied upon" and thus failed "to explain how the standard proposed is achievable under the range of relevant conditions which may affect the emissions to be regulated." Id. *123 at 431-33. Similar concerns figured in Natural Res. Def. Council, Inc. v. EPA, 655 F.2d 318, 331 (D.C.Cir.) (affirming auto-emission regulations), cert. denied, 454 U.S. 1017, 102 S.Ct. 552, 70 L.Ed.2d 415 (1981), where the court observed that when a new EPA regulation requires one industry to adopt emission-control technology "already in use in other industries," the EPA should show some evidence "that the technology can be transferred . . . or at least that relevant dissimilarities have been considered." Ibid.
Failings like those of the EPA in National Lime are simply not present here. The record contains substantial evidence that the mercury emission reductions of 75% to 90% in MSW incinerators, coal power-plants, and European mini-mills were being achieved on a regular basis. There is also substantial evidence concerning the differences between on the one hand, MSW incinerators and coal power-plants, and melters, on the other hand, in baghouse temperature, mercury speciation, and continuity of production to support the conclusion that melters would not have to perform much in the way of adapting the sorbent-injection control technology beyond determining the amount of sorbent that their operations require. That conclusion is even more reasonable because the control technology will only have to achieve the final 25% reduction needed to reach the limit of 35 mg per ton after the 50% reduction from source separation, and in five years' time rather than imminently.
Furthermore, those control technologies would not necessarily be more expensive than source separation. DEP estimated the cost of switch removal at $1140 per pound of mercury removed, whereas Terranext estimated that one of the injection technologies would cost $1300 per pound of mercury removed. Indeed, even if N.J.S.A. 26:2C-9.2c(2)(a) were applicable, as appellants argue, the record supports a finding that mercury emission-control technology is "reasonably available" to melters. To sum, DEP here relied on a considerable volume of scientific evidence. While appellants dispute its accuracy and the validity of the conclusions that DEP drew therefrom, no one may reasonably contest its existence.

(iii)
Appellants next claim that the regulations are invalid because DEP failed to provide a federal standards analysis, which is the assessment of costs and benefits that the Administrative Procedure Act (APA), N.J.S.A. 52:14B-1 to -25, requires to justify imposing standards that are stricter than applicable federal regulations. They argue that the regulations clearly exceed the federal standards, notwithstanding DEP's characterization of them as merely adding a backstop to the federal requirement of source separation, and that DEP failed to provide a cost-benefit analysis for imposing stricter standards. The argument is without merit.
Under the APA, a regulation is invalid "unless adopted in substantial compliance with this act." N.J.S.A. 52:14B-4(d). The APA recognizes "the declared policy of the State to reduce, wherever practicable, confusion and costs involved in complying with" regulations, which problems "are increased when there are multiple regulations of various governmental entities imposing unwarranted differing standards in the same area of regulated activity." N.J.S.A. 52:14B-22. It is therefore "in the public interest that State agencies consider applicable federal standards when adopting, readopting or amending regulations with analogous federal counterparts and determine whether these federal standards sufficiently protect the health, safety and welfare of New Jersey citizens." Ibid.
*124 Accordingly, when an agency adopts or amends a rule "in order to implement, comply with or participate in any program established under federal law or under a State statute that incorporates or refers to federal law, federal standards or federal requirements," N.J.S.A. 52:14B-24, it must provide "a statement as to whether the rule or regulation in question contains any standards or requirements which exceed the standards or requirements imposed by federal law." N.J.S.A. 52:14B-23. The statement must include "a discussion of the policy reasons and a cost-benefit analysis that supports the agency's decision to impose the standards or requirements" that exceed those of federal law. Ibid. The discussion must support a finding by DEP that "the State standard or requirement to be imposed is achievable under current technology, notwithstanding the federal government's determination that lesser standards or requirements are appropriate." Ibid.
Here, although DEP did provide a federal standards analysis, none was required as to melters because EPA's failure to regulate EAFS left a void and a complete absence of federal standards to be otherwise distinguished. In any event, DEP's discussion of melters met the statutory standards because the agency identified the absence of federal regulation, examined the policy reasons for initially requiring more-frequent stack testing than EPA did for other sources of mercury, explained why DEP believed that the reduction standards were achievable through a combination of source separation and emission-control technology, and justified the estimated cost per pound of reducing mercury emissions in light of the significant benefits to be achieved.

(iv)
Appellants further claim that the 75% reduction standard is invalid for vagueness. It argues that DEP adopted the Task Force's recommendation of a 75% reduction from estimated 1990 emission levels, but that the regulations fail to incorporate that baseline or any other, leaving it to guess how great a reduction is actually needed. We disagree.
The regulations require each melter facility to achieve by January 3, 2010, a level of mercury emissions that does not exceed 35 mg per ton. N.J.A.C. 7:27-27.6(a)(1). The regulations may also be satisfied by an alternative measure: "The reduction efficiency for control of mercury emissions of the air pollution control apparatus of any iron or steel melter shall be at least 75 percent[.]" N.J.A.C. 7:27-27.6(a)(2).
Even before DEP proposed these regulations, it had defined "control apparatus" as "any device which prevents or controls the emission of any air contaminant directly or indirectly into the outdoor atmosphere." N.J.A.C. 7:27-27.1. We therefore concur in DEP's assessment that the requirement of a 75% "reduction efficiency" for "the air pollution control apparatus" plainly means that the reduction must occur within the apparatus itself, or as DEP puts it, between the inlet and the outlet.
There is no vagueness as to the amount by which the mercury emissions of any melter must be reduced: they are to be reduced by whatever amount will result in stack-test results of 35 mg or less per ton of iron or steel produced. A melter operation that opts to rely entirely on control technology, rather than on source separation or a combination of the two, has the alternative of using an apparatus that will yield stack-test results at its outlet that are 75% lower than at its inlet.

(v)
Appellant Gerdau additionally claims that the regulations represent an *125 improper use of rulemaking to modify its permit, in that DEP lowered the permitted level of mercury emissions without the notice and hearing that are required for a proper permit review. This claim is moot. Operating permits must be renewed every five years. N.J.S.A. 26:2C-9.2c(7). Whatever emission reduction these regulations require, they do not require it before January 3, 2010, so the requirement does not apply to any permit that will expire before that date. Gerdau does not assert that the term of its permit will extend beyond that date, so its current permit is unaffected.

(vi)
Appellants raise additional issues including one by Gerdau that DEP failed to disclose four key documents on which it relied, depriving Gerdau of the opportunity to comment thereon. We have considered these remaining contentions and find them of insufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(D) & (E). As to the disclosure issue, suffice it to say, the June 10, 2003 memo used data that Gerdau itself had supplied from a facility with a baghouse, and as to the other three documents, there is no indication that they contained information on which DEP needed to rely, especially the October 2004 spreadsheet that was compiled nine months after the proposed regulations were issued.
Affirmed.
NOTES
[1] U.S. Pipe and Foundry withdrew its appeal in this matter.
[2] In addition to activated carbon, Terranext also referenced other injection technologies involving the chemical reagents sodium tetrasulfide and oxidized lime sorbent, and estimated their costs per pound of mercury removed from a mini-mill's exhaust.
[3] The other three sources were MSW incinerators, incinerators of infectious wastes, and coal power-plants.
[4] Compliance with these standards is to be determined through mandatory quarterly emission testing beginning one year after the operative date of the rules. So long as an operator achieves compliance for eight consecutive quarters, subsequent compliance may be demonstrated by testing only once each year, during the fourth quarter, for as long as compliance with the standard continues to be so demonstrated. 36 N.J.R. 138-39.
[5] The federal requirements for source separation and related work practices are indeed similar to the ones DEP proposed, but the federal requirements only apply to a facility that is "a major source" of a HAP, meaning with the potential to emit 10 tons per year. 40 C.F.R. §§ 63.7681, 63.7700. Furthermore, while EPA has set limits for total emissions of HAPs and particulate matter by iron and steel melters that use EAFs, those limits do not contain a particular limit for mercury, 40 C.F.R. § 63.7690(a), and no party here has attempted to correlate that overall limit to mercury emissions of any type or amount from any kind of industrial operation.
[6] DEP estimated that EAFs would, depending on facility size, incur control technology costs ranging from $6000 to $38,000 per pound of mercury removed. 36 N.J.R. 129. Quarterly stack testing costs were projected to be between $10,000 and $15,000 each, but, as noted, the frequency for facilities demonstrating compliance would be reduced to only once per year. 36 N.J.R. 129.