SYLLABUS

This syllabus is not part of the Court's opinion.  It has been prepared by the Office of the Clerk for the convenience of the reader.  It has been neither reviewed nor approved by the Court.  In the interest of brevity, portions of an opinion may not have been summarized.

**In re Attorney General Law Enforcement Directive Nos. 2020-5 and 2020-6**
**(A-26/27/28/29/30-20) (085017)**

**Argued March 2, 2021 -- Decided June 7, 2021**

**RABNER, C.J., writing for a unanimous Court.**

In June 2020, weeks after George Floyd was killed at the hands of a Minneapolis Police Officer, the Attorney General for New Jersey issued two Directives.  They call for the release of the names of law enforcement officers who commit disciplinary violations that result in the imposition of "major discipline" -- termination, demotion, or a suspension of more than five days.  A summary of the misconduct and the sanction imposed must also be disclosed.  In this appeal, the Court considers challenges brought against the Directives by five groups representing state and local officers.

Directive 2020-5 applies to all law enforcement agencies in the State, including local police departments; Directive 2020-6 applies to the State Police and other agencies within the Department of Law and Public Safety (Department).  Both Directives encompass all findings of major discipline after January 1, 2020.  In addition, for the State Police and other agencies within the Department, officers subjected to major discipline dating back twenty years would be identified publicly.  The Directives mark a sharp change in practice.  Previously, the Attorney General fought to shield the identities of law enforcement officers disciplined for serious misconduct.

Appellants and intervenors challenged the Directives on a number of grounds. The Appellate Division upheld the Directives against the parties' facial challenge.  465 N.J. Super. 111, 128-29, 162 (App. Div. 2020).  The court concluded that the Attorney General had the authority to issue the Directives and found that the Directives did not conflict with the Open Public Records Act (OPRA) or other authorities relating to the confidentiality of personnel records.  Id. at 140-48.  The court also found the retroactive nature of the Directives did not run counter to ex post facto principles.  Id. at 149.

In light of the limited record before it and the fact that appellants brought only a facial challenge to the Directives, the Appellate Division declined to address any contract claims or related arguments based on promissory and equitable estoppel, id. at 153-54, leaving open the possibility of individual as-applied challenges, id. at 154-55.

1

The Appellate Division found that the Directives did not violate constitutional guarantees of due process, id. at 156-57, or equal protection, id. at 157-59. The court also rejected claims that the Directives violate the Administrative Procedure Act (APA), id. at 159-60, and that they impair appellants' right to contract and violate their constitutional right to collective negotiations, id. at 160-61. Finally, the appellate court concluded the Directives are not arbitrary, capricious, unreasonable, or against public policy. Id. at 161.

The Court granted appellants' petitions for certification. 244 N.J. 447 (2020).

**HELD:**        *The Attorney General had the authority to issue the Directives, which satisfy the deferential standard of review for final agency decisions. The Directives are designed to enhance public trust and confidence in law enforcement, to deter misconduct, to improve transparency and accountability in the disciplinary process, and to identify repeat offenders who may try to move from one sensitive position to another. In short, the Directives are consistent with legislative policies and rest on a reasonable basis.

*The Court does not find merit in the bulk of the remaining challenges but explains that one claim requires more careful attention: Officers subjected to major discipline for the past twenty years say they were promised that their names would not be released, and that they relied on that promise in resolving disciplinary accusations. In essence, they ask the State to stand by promises they claim were made throughout the prior twenty years. To resolve that serious issue, a judge will need to hear and evaluate testimony and decide if the elements of the doctrine of promissory estoppel have been met for disciplinary matters settled before the Directives were announced. The Court offers guidance for that process and, in a separate order, designates a single Judge of the Superior Court to conduct the hearing described in section VI.B of the opinion.

*The identities of officers subject to major discipline since the Directives were issued in June 2020 may be disclosed; going forward, future disciplinary sanctions can be disclosed in the same manner.

1. The Attorney General has broad authority over criminal justice matters, including "the general supervision of criminal justice," N.J.S.A. 52:17B-98, and the power to "adopt rules and regulations for the efficient conduct of the work and general administration of the [D]epartment, its officers and employees," N.J.S.A. 52:17B-4(d). Over the years, multiple Attorneys General have exercised that power to establish policies for the internal affairs review process through the issuance of Internal Affairs Policy and Procedures manuals (IAPPs). The first IAPP, in 1991, established a comprehensive set of procedures to address allegations of officer misconduct. Five years later, the Legislature directed every law enforcement agency in the State to adopt guidelines consistent with the IAPP. N.J.S.A. 40A:14-181. Since 1991, each iteration of the IAPP has provided that the progress of investigations and contents of case files were confidential but could be released in limited circumstances. (pp. 20-22)

2.  Directives 2020-5 and 2020-6 altered historical practice by requiring that officers subject to major discipline be identified publicly.  Directive 2020-5 applies not only prospectively but also for at least five months before it was issued.  In addition, it states that "nothing . . . prevents agencies from releasing similar information regarding historical incidents of officer misconduct."  And Directive 2020-6, beyond its prospective application, requires the agencies to which it applies to "publish the names of any officers who have been subject to serious discipline in the past twenty years."  (pp. 22-24)

3.  Under OPRA, government records are subject to disclosure unless the law exempts them from access.  Appellants highlight section 10 of the law, which limits the disclosure of personnel and pension records.  See N.J.S.A. 47:1A-10.  Section 10, however, contains an important exception:  "[P]ersonnel or pension records . . . shall be accessible when required to be disclosed by another law . . . ."  Ibid. (emphasis added).  A regulation the Department adopted in 2014 provides that certain records "shall not be considered government records subject to public access" under OPRA, but this regulation does not apply to "records enumerated in N.J.S.A. 47:1A-10 as available for public access."  N.J.A.C. 13:1E-3.2(a)(4).  In other words, a record subject to disclosure under section 10 of OPRA is likewise subject to disclosure under the regulation.  The same exception is embedded in Executive Order 11, issued by Governor Byrne:  "Except as otherwise provided by law . . . an instrumentality of government shall not disclose . . . personnel or pension records of an individual."  (emphasis added).  (pp. 24-26)

4.  Based on their statutory authority, see N.J.S.A. 52:17B-98 and -4(d), Attorneys General have issued directives that govern the disciplinary process.  Attorney General directives relating to the administration of law enforcement have the "force of law."  See N. Jersey Media Grp., Inc. v. Township of Lyndhurst, 229 N.J. 541, 565 (2017).  The IAPP, in particular, carries the force of law for State and local law enforcement.  Fraternal Ord. of Police, Newark Lodge No. 12 v. City of Newark, 244 N.J. 75, 100-01 (2020).  Moreover, the Legislature enacted a separate statute that underscores the force of the IAPP.  N.J.S.A. 40A:14-181 embraces the Attorney General's policy on internal affairs matters by directing law enforcement agencies throughout the state to adopt guidelines consistent with the IAPP.  And the policy in effect at the time section 181 was enacted -- the 1992 IAPP -- declared that police executives, like the Attorney General, could release disciplinary records.  The Directives therefore do not conflict with OPRA, N.J.A.C. 13:1E-3.2(a), or Executive Order 11.  (pp. 27-28)

5.  Courts apply a deferential standard to final agency actions and will not overturn them unless they are arbitrary, capricious, or unreasonable.  For actions like the Directives, judicial intervention is limited to those rare circumstances in which it is clear the agency action is inconsistent with its mandate.  The Legislature empowered the Attorney General to issue directives.  To determine whether a particular directive is arbitrary, capricious, or unreasonable, courts consider whether "there is any fair argument in support of the course taken."  Flanagan v. Dep't of Civ. Serv., 29 N.J. 1, 12 (1959).  (pp. 29-33)

6.  The Court reviews the Directives, which detail the Attorney General's justification for releasing the names of officers subject to major discipline.  The Court also reviews appellants' concerns and arguments about the wisdom and consequences of the Directives.  Disagreement over a policy, however, does not make it arbitrary, capricious, or unreasonable.  If an administrative action is consistent with legislative policies, rests on a reasonable basis, reflects careful consideration of the issues, and can otherwise satisfy the standard for appellate scrutiny, the policy should be upheld.  Here, the Attorney General exercised authority the Legislature placed in his office to develop and revise disciplinary policies.  He acted to enhance public trust and confidence in law enforcement, to deter misconduct, to improve transparency and accountability in the internal affairs process, and to prevent officers from evading the consequences of their misconduct.  The Attorney General's reasoned bases for acting were fully consistent with the Department's mandate.  The Directives implement a practice that is common in other professions.  Once again, thoughtful concerns in opposition to a new policy are not fatal to administrative action.  The Attorney General's decision to release the names of law enforcement officers subject to major discipline is consistent with his delegated authority and grounded in reason.  It is not arbitrary, capricious, or unreasonable.  (pp. 33-40)

7.  The Ex Post Facto Clause is aimed at laws that retroactively alter the definition of crimes or increase the punishment for criminal acts.  The Directives do none of those things.  Nor do they reflect a change in the law.  The Attorney General's authority is grounded in statutes enacted decades ago, and the Attorney General has advised officers for more than twenty years that internal affairs records might be released.  Insofar as appellants challenge the Attorney General's exercise of his discretionary authority to change longstanding practice, their claim emphasizes estoppel principles.  (pp. 40-41)

8.  Appellants argue that the Directives violate the doctrine of promissory estoppel; they also rely on the related theory of equitable estoppel.  The Court reviews the elements of those claims and notes that appellants submitted multiple certifications to demonstrate that the Office of the Attorney General made clear promises of confidentiality throughout the disciplinary process.  (pp. 41-43)

9.  Although the record is incomplete, it raises significant concerns in that it suggests that officers who agreed to major discipline received assurances of confidentiality.  Each IAPP stresses that records of internal affairs investigations are confidential and that files must be "clearly marked as confidential."  In addition, a series of certifications in the record from the Superintendent of the State Police and others assert that for many years, the internal affairs process has been replete with promises of confidentiality and reassurances from state officials to officers who agreed to discipline.  Representations made by the Attorney General in a 2018 brief in another matter appear to validate part of the certifications before the Court in this case.  The disclosure of disciplinary records in criminal cases and in response to civil discovery requests does not undermine appellants' estoppel argument.  (pp. 43-50)

4

10.  The Court exercises its supervisory authority to establish a process for consideration of the estoppel claims raised by officers who settled their disciplinary actions, which will help ensure that relevant issues are resolved in a uniform and efficient manner.  In section VI.B of the opinion, the Court details that process for State Troopers, which will begin with a broad-ranging evidentiary hearing before a single judge.  The hearing should explore the practice of the State Police relating to disciplinary matters, and the question of confidentiality, in particular, before the Directives were issued.  If the court finds that promises of confidentiality were made and relied on consistent with the appropriate legal standards, it could bar the release of names of law enforcement officers subject to Directive 2020-6 for disciplinary matters settled before June 19, 2020.  If the record does not support such a conclusion for the entire group of officers, the court's more limited findings may be incorporated and made part of the record in individual challenges that will likely follow.  The Court provides guidance for those challenges, including that officers will have 45 days to file an action upon receiving notice of proposed disclosure by the Attorney General.  (pp. 50-53)

11.  The Court does not separately address potential challenges that may arise if or when local chief law enforcement executives decide to release names of officers involved in historical incidents of misconduct.  If parties seek to challenge orders by chief law enforcement executives, pursuant to Directive 2020-5, on estoppel grounds, they may file an application with the Assignment Judge in their respective vicinages.  Assignment Judges have the authority to set up a process similar to the one outlined for State Troopers -- a broad-based evidentiary hearing about an agency's disciplinary practices, followed by individual as-applied challenges, if necessary.  The procedures outlined in section VI.B for as-applied challenges brought by Troopers would apply.  (pp. 53-54)

12.  For major discipline imposed after the Attorney General issued the Directives, officers can expect their identities will be released to the public.  They may challenge disciplinary findings in the ordinary course.  The framework outlined in section VI.B applies only to historical cases of major discipline, imposed before the Directives were issued, in which officers challenge the release of their names on estoppel grounds.  (pp. 54-55)

13.  Appellants claim the Directives violate their rights to substantive and procedural due process and equal protection; run afoul of the APA; impair their constitutional right to contract; and violate their constitutional right to collective negotiations.  As to those points, the Court affirms the judgment of the Appellate Division largely for the reasons stated in Judge Accurso's thoughtful opinion.  See 465 N.J. Super. at 155-61.  (p. 55)

**The judgment of the Appellate Division is AFFIRMED AS MODIFIED.**

**JUSTICES LaVECCHIA, ALBIN, PATTERSON, FERNANDEZ-VINA, SOLOMON, and PIERRE-LOUIS join in CHIEF JUSTICE RABNER's opinion.**

# SUPREME COURT OF NEW JERSEY
## A-26/27/28/29/30 September Term 2020
## 085017

In re Attorney General
Law Enforcement Directive
Nos. 2020-5 and 2020-6

On certification to the Superior Court,
Appellate Division, whose opinion is reported at
465 N.J. Super. 111 (App. Div. 2020).

| Argued | Decided |
|--------|---------|
| March 2, 2021 | June 7, 2021 |

Kevin D. Jarvis argued the cause for appellant New
Jersey Law Enforcement Superior Officers Association
(O'Brien, Belland & Bushinsky, attorneys; Kevin D.
Jarvis and Matthew B. Madsen, on the briefs).

James M. Mets argued the cause for appellant State
Troopers Fraternal Association of New Jersey (Mets
Schiro & McGovern and Markman & Cannan, attorneys;
James M. Mets and Robert R. Cannan, of counsel and on
the briefs, and Brian J. Manetta, on the briefs).

Katherine Hartman argued the cause for appellants State
Troopers Non-Commissioned Officers Association of
New Jersey and State Troopers Superior Officers
Association of New Jersey, and their current respective
presidents, Pete J. Stilianessis and Richard Roberts
(Attorneys Hartman, Chartered, Law Offices of Robert A.
Ebberup, Law Office of D. John McAusland, and Loccke,
Correia & Bukosky, attorneys; Katherine D. Hartman,
Mark A. Gulbranson, Jr., Robert A. Ebberup, D. John
McAusland, and Michael A. Bukosky, on the briefs).

1

Matthew Areman argued the cause for appellants New Jersey State Policemen's Benevolent Association and New Jersey State Lodge of the Fraternal Order of Police and their current respective presidents, Patrick Colligan and Robert W. Fox (Zazzali, Fagella, Nowak, Kleinbaum & Friedman, attorneys; and Markowitz & Richman, attorneys; Paul L. Kleinbaum, Craig A. Long, and Matthew Areman, on the briefs).

Frank M. Crivelli argued the cause for appellants Policemen's Benevolent Association Local Number 105, Policemen's Benevolent Association Local Number 383, Policemen's Benevolent Association Local 383A, Policemen's Benevolent Association Local 383B, and the New Jersey Law Enforcement Supervisors Association (Crivelli & Barbati, attorneys; Frank M. Crivelli, on the briefs).

Jeremy Feigenbaum, State Solicitor, argued the cause for respondent Attorney General of New Jersey (Gurbir S. Grewal, Attorney General, attorney; Jeremy Feigenbaum and Jane C. Schuster, Assistant Attorney General, of counsel and on the briefs, and Christopher Weber, Sean P. Havern, Patrick Jhoo, Brandon C. Simmons, Emily K. Wanger, and Emily Marie Bisnauth, Deputy Attorneys General, on the briefs).

Vito A. Gagliardi, Jr. argued the cause for amicus curiae New Jersey State Association of Chiefs of Police (Porzio Bromberg & Newman, attorneys; Vito A. Gagliardi, Jr., of counsel and on the brief, and David L. Disler and Thomas J. Reilly, on the brief).

Joseph E. Krakora, Public Defender, argued the cause for amici curiae Public Defender of New Jersey and Association of Criminal Defense Lawyers of New Jersey (Joseph E. Krakora, Public Defender, attorney; and Gibbons, attorneys; Joseph E. Krakora and Lawrence S. Lustberg, on the brief).

2

Alexander Shalom argued the cause for amici curiae American Civil Liberties Union of New Jersey, Bayard Rustin Center for Social Justice, Cherry Hill Women's Center, Ethical Culture Society of Bergen County, Fair Share Housing Center, Faith in New Jersey, Housing and Community Development Network of New Jersey, Latino Action Network, LatinoJustice PRLDEF, Legal Advocacy Project of UU FaithAction of New Jersey, Libertarians for Transparent Government, NAACP Newark, National Association for the Advancement of Colored People New Jersey State Conference, National Organization for Women of New Jersey, Newark Communities for Accountable Policing, New Jersey Alliance for Immigrant Justice, New Jersey Clergy Coalition for Justice, New Jersey Coalition Against Sexual Assault, New Jersey Institute for Social Justice, New Jersey Prison Justice Watch, Partners for Women and Justice, People's Organization for Progress, Salvation and Social Justice, Service Employees International Union Local 32BJ, SPAN Parent Advocacy Network, Volunteer Lawyers for Justice, Women Who Never Give Up, Inc. (American Civil Liberties Union of New Jersey Foundation; attorneys; Alexander Shalom, Jeanne LoCicero, Karen Thompson, and Molly K.C. Linhorst, on the brief).

CJ Griffin argued the cause for amici curiae National Coalition of Latino Officers and Law Enforcement Action Partnership (Pashman Stein Walder Hayden, attorneys; CJ Griffin, on the brief).

Bruce S. Rosen submitted a brief on behalf of amicus curiae Reporters Committee for Freedom of the Press (McCusker, Anselmi, Rosen & Carvelli; attorneys; Bruce S. Rosen, on the brief).

CHIEF JUSTICE RABNER delivered the opinion of the Court.

In June 2020, weeks after George Floyd was killed at the hands of a Minneapolis Police Officer, the Attorney General for New Jersey issued two Directives. They call for the release of the names of law enforcement officers who commit disciplinary violations that result in the imposition of "major discipline" -- termination, demotion, or a suspension of more than five days. A summary of the misconduct and the sanction imposed must also be disclosed.

One Directive applies to all law enforcement agencies in the State, including local police departments; the other applies to the State Police and other agencies within the Department of Law and Public Safety (Department). Both Directives encompass all findings of major discipline after January 1, 2020. In addition, for the State Police and other agencies within the Department, officers subjected to major discipline dating back twenty years would be identified publicly.

The Directives mark a sharp change in practice. Previously, the Attorney General fought to shield the identities of law enforcement officers disciplined for serious misconduct.

Five groups representing state and local officers challenged the Directives on multiple grounds. In a comprehensive opinion, the Appellate Division rejected their facial challenge to the Directives. In re Att'y Gen. L.

4

Enf't Directive Nos. 2020-5 & 2020-6, 465 N.J. Super. 111, 162 (App. Div. 2020). We do as well.

We find that the Attorney General had the authority to issue the Directives. In evaluating them, appellate review of final agency decisions, which the Directives represent, is limited to whether an action is arbitrary, capricious, unreasonable, or contrary to public policy. See In re State & Sch. Emps.' Health Benefits Comm'ns' Implementation of Yucht, 233 N.J. 267, 279 (2018).

The challengers present a number of concerns; yet, in our view, the Directives satisfy the deferential standard of review. They are designed to enhance public trust and confidence in law enforcement, to deter misconduct, to improve transparency and accountability in the disciplinary process, and to identify repeat offenders who may try to move from one sensitive position to another. In short, the Directives are consistent with legislative policies and rest on a reasonable basis.

We do not find merit in the bulk of the remaining challenges. One claim, however, requires more careful attention. Going forward, officers can expect that their names will be disclosed if they commit acts that result in major discipline. Officers subjected to that level of discipline for the past twenty years, however, present a straightforward argument: they say they

were promised that their names would not be released, and that they relied on that promise in resolving disciplinary accusations. The officers present a number of certifications in support of that claim, including one from the former Superintendent of the State Police. In essence, they ask the State to stand by promises they claim were made throughout the prior twenty years.

To resolve that serious issue, a judge will need to hear and evaluate testimony and decide if the elements of the doctrine of promissory estoppel have been met. To establish an orderly process for potentially hundreds of future proceedings, we offer guidance for disciplinary cases resolved up to twenty years before the Directives were issued.

A single trial judge will be designated to hear testimony that could apply to all of the challenges. The judge's ruling might resolve the claim as a whole; if not, the record created at the hearing can be used in individual as-applied challenges that State Troopers and others can pursue afterward. A similar process can be used in the event local officials choose to release historical incidents of serious misconduct.

To be clear, that process will apply only to disciplinary matters settled before the Directives were announced. The Attorney General had the right to change course and direct that details of future serious disciplinary matters -- including the names of the officers disciplined -- will be revealed to the public.

That practice is routine in other professions and shines light on both the overall disciplinary process and individual wrongdoing. The identities of officers subject to major discipline since the Directives were issued in June 2020 may be disclosed; going forward, future disciplinary sanctions can be disclosed in the same manner.

We therefore modify and affirm the judgment of the Appellate Division and remand for further proceedings consistent with this opinion.

I.

George Floyd's death on May 25, 2020 prompted nationwide protests and calls for greater accountability of police officers. Several weeks later, New Jersey Attorney General Gurbir S. Grewal issued two directives that require the release of the names of law enforcement officers who receive, and have received, major discipline. See Attorney General, Directive Requiring Public Disclosure of the Identities of Officers Who Commit Serious Disciplinary Violations (June 15, 2020) (Directive 2020-5); Attorney General, Directive Requiring Public Disclosure of the Identities of Department's Officers Who Committed Serious Disciplinary Violations Since 2000 (June 19, 2020) (Directive 2020-6).

As noted above, Directives 2020-5 and 2020-6 require law enforcement agencies to publish summaries of complaints against law enforcement officers

7

that result in an officer's termination, demotion, or suspension for more than five days. Each officer's identity, along with the sanction imposed, must be disclosed as well.

Directive 2020-5 applies to all local and county law enforcement. The Directive required each agency to publish its first report by December 31, 2020, covering disciplinary actions for the prior twelve months. Agencies could choose to disclose historical incidents of misconduct as well.

Directive 2020-6 applies to three agencies in the Department: the New Jersey State Police; Division of Criminal Justice; and Juvenile Justice Commission. The Directive required each agency to disclose, no later than July 15, 2020, the same information dating back to January 1, 2000: the names of officers subject to major discipline; a synopsis of their misconduct; and the sanction imposed. Under the Directive, each agency must give at least seven days' prior notice before publication to each officer, "whenever possible." For retired employees, the agencies must "make reasonable efforts to contact the officer[s] at their last known residential address, email address, or phone number."

The Attorney General stated that he issued the Directives pursuant to his authority to provide for the "general supervision of criminal justice" as the

State's chief law enforcement officer. The Directives and their rationale are discussed in greater detail below.

Five groups filed a facial challenge to the Directives: the State Troopers Fraternal Association of New Jersey and, as intervenors, the Association of Former New Jersey State Troopers, the New Jersey Former Troopers Heritage Foundation, Inc., and Former Trooper Members and FTA Members No. 1 & 2; the State Troopers Non-Commissioned Officers Association of New Jersey, the State Troopers Superior Officers Association of New Jersey, and their respective presidents, Pete J. Stilianessis and Richard Roberts; Policemen's Benevolent Association (PBA) Local Number 105, PBA Local Number 383, PBA Local Number 383A, PBA Local Number 383B, and the New Jersey Law Enforcement Supervisors Association; the New Jersey Superior Officers Law Enforcement Association (NJSOA); and the New Jersey State Policemen's Benevolent Association, the New Jersey State Lodge of the Fraternal Order of Police, and their respective presidents, Patrick Colligan and Robert W. Fox.

Appellants and intervenors challenged the Directives on a number of grounds. They claimed that the Attorney General lacked the authority to issue the Directives; that the Directives were arbitrary, capricious, unreasonable, and contrary to public policy; that retroactive disclosure of the names of officers violated equitable doctrines; that the Directives ran afoul of the Administrative

9

Procedure Act (APA); that they violated various constitutional rights, including substantive and procedural due process, equal protection, and the right to contract and to collective negotiations; and that the Directives violated ex post facto principles.

The Appellate Division stayed implementation of the Directives pending the outcome of the challenge; that stay remains in effect. The court also consolidated the appeals and granted motions to participate as amici curiae to the following groups: the New Jersey State Association of Chiefs of Police; the American Civil Liberties Union of New Jersey along with 23 other organizations (ACLU); the Association of Criminal Defense Lawyers of New Jersey and the New Jersey State Office of the Public Defender; and the National Coalition of Latino Officers and the Law Enforcement Action Partnership.

The Appellate Division upheld the Directives against the parties' facial challenge. In re Att'y Gen. Directives, 465 N.J. Super. at 128-29, 162. The court first concluded that the Attorney General had the authority to issue Directives 2020-5 and 2020-6. The court found the Directives did not conflict with section 10 of the Open Public Records Act (OPRA), N.J.S.A. 47:1A-10; a regulation the Department adopted when OPRA was enacted, N.J.A.C. 13:1E-

13.2; and Executive Order 11, issued by Governor Brendan Byrne, all relating to the confidentiality of personnel records. Id. at 140-48.

The court also found the retroactive nature of the Directives did not run counter to ex post facto principles. Id. at 149. The Appellate Division noted the Directives were neither penal nor criminal in nature, and rested on longstanding statutory authority, not a change in the law. Ibid. Although not convinced that a retroactivity analysis was warranted, the Appellate Division concluded the Directives would survive such a challenge. Id. at 150. The court explained the officers "have no constitutionally protected vested right that the Directives could infringe," ibid., and the Directives did not constitute a manifest injustice, id. at 151-52.

The Appellate Division acknowledged the Directives represented a "sea change . . . in the Department's policy regarding the confidentiality of officer disciplinary records and" had engendered "deep feelings of unfairness . . . among law enforcement officers," who claimed they "were promised confidentiality when they settled internal disciplinary charges." Id. at 152-53. The court also referred to the Attorney General's concession that "some officers might have contract claims to the confidentiality of internal settlement agreements." Id. at 153.

11

In light of the limited record before it and the fact that appellants brought only a facial challenge to the Directives, the Appellate Division declined to address any contract claims or related arguments based on promissory and equitable estoppel. Id. at 153-54. The court left open the possibility of individual as-applied challenges and directed that officers be given fourteen days' notice -- rather than the seven-day period the Directives provided -- to pursue such claims. Id. at 154-55.

The Appellate Division rejected appellants' various constitutional arguments. The court found the Directives did "not rise to the level of a substantive due process violation implicating [appellants'] reputation or privacy rights" under federal law. Id. at 156. Nor did the claim that appellants' "substantive due process right to privacy under [the] State Constitution fare [any] better." Ibid. The court reasoned that

> appellants cannot show they have a constitutionally protected reasonable expectation of privacy in their disciplinary records that is not outweighed by the government's interest in public disclosure, in light of prior case law establishing their diminished expectation of privacy in those records, and the clear statement . . . since 2000 that the Attorney General could order the release of the records.
>
> [Ibid. (citing Doe v. Poritz, 142 N.J. 1, 88-91 (1995)).]

"[M]indful that [the] State Constitution extends due process protection to personal reputation," the appellate court found "no general right to a hearing

12

here." Ibid. The court added that "all affected officers have already received all the process they were due for their disciplinary charges, including representation by their union." Id. at 156-57.

The Appellate Division also found no merit in appellants' equal protection claims. The court observed that appellants "are not members of a suspect class and no fundamental constitutional right is impinged by publication of their disciplinary records." Id. at 157. The court therefore examined, and found, a rational basis for differentiating between law enforcement officers and other public employees: Disclosure of "the names of law enforcement officers who have received major discipline is obviously rationally related to the Attorney General's goal of increasing transparency of internal affairs and officer discipline in the State's law enforcement agencies, thereby making them more accountable to the communities they serve." Id. at 158.

In addition, the Appellate Division found the distinction between officers in the Department and those in local law enforcement was supported by rational bases. Id. at 159. Only the first group faced certain disclosure of major discipline dating back twenty years. Among other reasons proffered by the Attorney General, the court cited his explanation that the decision to release information about historical misconduct of local law enforcement

13

should be left to "the law enforcement executive closest to the community." Id. at 158.

The appellate court found the outcome would be the same under the State Constitution. Id. at 159. Balancing "the affected officers' right in the confidentiality of their disciplinary records [and] the extent to which the Directives impinge that right . . . against the public need for disclosure," the court concluded "the public need for more transparency in the internal affairs processes of the State's law enforcement agencies in this period of fraying public trust in law enforcement outweighs the officers' limited privacy right in their disciplinary records." Ibid.

The Appellate Division next rejected appellants' claim that the Directives violate the APA. Id. at 159-60. The court observed the Directives "fall within a statutory exception to the APA's definition of an administrative rule, because they constitute 'statements concerning the internal management or discipline of an agency.'" Id. at 160 (quoting N.J.S.A. 52:14B-2). As a result, the court found the Directives did not need to be promulgated through the APA's formal rulemaking process. Ibid.

The court also rejected appellants' claims that the Directives impair their right to contract and violate their constitutional right to collective negotiations. The court noted that no collectively negotiated agreements in the record

14

"address[] the confidentiality of . . . disciplinary records . . . other than to require compliance with the" Attorney General's Internal Affairs Policy & Procedures (IAPP). Ibid. Moreover, the court observed, the Attorney General issued the IAPP pursuant to statutory authority, N.J.S.A. 40A:14-181, "outside the collective negotiations process." Ibid. The Appellate Division accordingly concluded "a contract impairment analysis [was] unnecessary." Ibid.

The court added that any claims that "confidentiality assurances are mandatorily negotiable" must first be brought before the Public Employees Relations Commission. Id. at 160-61.

Finally, the Appellate Division concluded the Directives are not arbitrary, capricious, unreasonable, or against public policy. Id. at 161. The court credited the Attorney General's concern that public confidence in State and local law enforcement officers -- which is "essential for them to safely and effectively perform their jobs" -- "has become seriously frayed." Ibid. As the court explained, the Attorney General "determined he could best improve that trust by instilling greater accountability in the internal affairs processes that govern officer misconduct by ending the long practice of shielding the identities of officers receiving major discipline." Ibid. The Attorney General's Directives, the Appellate Division determined, "appear[] to us

15

neither arbitrary nor capricious and, instead, consistent with existing law and evolving public policy." Id. at 162.

The Appellate Division stayed the Directives for five days so that appellants could seek review before this Court. Ibid. At the same time appellants filed for emergent relief here, the Attorney General in essence consented to a further stay pending the outcome of the case. Soon after, we granted appellants' petitions for certification. 244 N.J. 447 (2020).

All of the amici who appeared before the Appellate Division continued to participate in this appeal. See R. 1:13-9(d). We also granted leave to the Reporters Committee for Freedom of the Press to appear as amicus curiae, and to three additional organizations that joined the ACLU.

## II.

Appellants represent members of the State's 36,000 active law enforcement officers and some retired officers. See N.J. State Police, Uniform Crime Report, State of New Jersey 2016 174 (2016), https://www.njsp.org/ucr/ 2016/pdf/2016a_uniform_crime_report.pdf. They largely raise the same arguments they presented to the Appellate Division. Because their arguments overlap, we summarize them together where possible.

Appellants first argue that the Attorney General lacks authority to issue the Directives because they conflict with section 10 of OPRA (N.J.S.A. 47:1A-

16

10), regulations including N.J.A.C. 13:1E-3.2, and executive orders including Executive Order 11 (Byrne). Appellants contend those sources protect the confidentiality of public employees' personnel records and prohibit the disclosures the Directives require.

Next, appellants claim the Directives are arbitrary, capricious, unreasonable, and contrary to public policy. Among other arguments, they contend the Attorney General failed to demonstrate the Directives will build trust and promote transparency or that the benefits of the Directives outweigh the potential harm to officers.

Appellants also contend that many officers accepted discipline under negotiated settlement agreements in exchange for a promise of confidentiality. According to appellants, implementing the Directives would breach those promises, violate the doctrines of promissory and equitable estoppel, and fail to "turn square corners." As a result, appellants seek to permanently enjoin the Attorney General from enforcing the Directives.

Certain appellants raise a number of additional arguments. They claim the Directives violate the officers' rights to substantive and procedural due process and equal protection, impair their rights to contract and to negotiate collectively, violate the APA, and apply retroactively in an unfair manner.

17

Appellant NJSOA adds that the Appellate Division's instructions about individual as-applied challenges are vague and unworkable and fail to provide officers enough time to challenge the release of disciplinary information.

The New Jersey State Association of Chiefs of Police, as amicus, focuses on the retroactive nature of the Directives. The Association contends the Directives are arbitrary, capricious, and unreasonable to the extent they are applied retroactively. The Association also submits the Appellate Division's instructions for as-applied challenges are impractical.

The Attorney General counters that the Directives promote trust, transparency, and accountability; are not arbitrary or capricious; do not run afoul of OPRA or any regulations or executive orders; are consistent with estoppel doctrines, principles of retroactivity, and constitutional privacy principles; are not subject to formal rulemaking under the APA; and do not violate appellants' due process rights, the privacy of victims, the requirements of equal protection, or collective negotiations rights or contractual agreements. The Attorney General asks the Court to place careful limits on as-applied challenges and urges the Court to affirm the judgment of the Appellate Division.

A number of amici support the Directives. The ACLU and 26 other organizations argue that police accountability requires transparency of police

18

discipline. The organizations contend the Directives will provide the public with critical information and, in turn, promote trust in the police and public safety. The organizations note that many regulated professions in New Jersey have transparent disciplinary processes.

The National Coalition of Latino Officers and Law Enforcement Action Partnership argue that transparency greatly benefits police officers and promotes community trust. The groups also submit that transparency protects the rights of officers of color and will improve the overall disciplinary process for all officers.

The Association of Criminal Defense Lawyers of New Jersey and the Public Defender argue the Directives promote discovery of prior police misconduct in criminal cases, consistent with New Jersey's broad discovery rules and the State's constitutional obligation to produce exculpatory evidence.

The Reporters Committee for Freedom of the Press submits that the Directives will allow the news media to inform the public about officers' misconduct and responses by law enforcement agencies. The Committee also argues the Directives are compatible with OPRA.

### III.

We first consider the Attorney General's authority to issue the Directives.

19

A.

As the State's chief law enforcement officer, the Attorney General has broad authority over criminal justice matters that derives from several sources. The Criminal Justice Act of 1970 declares it "the public policy of this State to encourage cooperation among law enforcement officers and to provide for the general supervision of criminal justice by the Attorney General as chief law enforcement officer of the State." N.J.S.A. 52:17B-98. The "[A]ct shall be liberally construed to achieve these ends." Ibid.

The Legislature also empowered the Attorney General to "[f]ormulate and adopt rules and regulations for the efficient conduct of the work and general administration of the [D]epartment, its officers and employees." N.J.S.A. 52:17B-4(d). Over the years, multiple Attorneys General have exercised that power to establish standards and policies for the internal affairs review process of the State's law enforcement agencies.

In 1991, Attorney General Del Tufo issued the first Internal Affairs Policy and Procedures manual. It established a comprehensive set of procedures to address "allegations of officer misconduct or the improper delivery of police services," for the purposes of "bolster[ing] the integrity of the police department." 1991 IAPP at 15. Five years later, the Legislature directed every law enforcement agency in the State, including local police

20

departments, to "adopt and implement guidelines which shall be consistent with the guidelines governing the [IAPP]." N.J.S.A. 40A:14-181. The guidelines must be consistent with tenure and civil services laws and "shall not supersede any existing contractual agreements." Ibid.

Each iteration of the IAPP has addressed the confidentiality of the disciplinary process. The 1991 IAPP expressly guaranteed that "[t]he progress of internal affairs investigations and all supporting materials are considered confidential information," and "[t]he contents of the internal investigation case files will be retained in the Internal Affairs Unit and clearly marked as confidential." 1991 IAPP at 15. Disciplinary hearings would "be closed to the public," unless the accused officer requested otherwise, and "[o]nly the police executive or his designee [was] empowered to release publicly the details of an internal investigation or disciplinary action." Ibid.

Revisions to the IAPP followed a similar approach: the progress of investigations and contents of case files were confidential but could be released in limited circumstances. The revised 2000 IAPP, for example, stated that "information and records of an internal investigation" could be released "[u]pon the request or at the direction of the county prosecutor or Attorney General." 2000 IAPP at 11-46. "The law enforcement executive officer" could allow "access [to] a particular file or record for good cause," and such

21

access was to be granted "sparingly." Id. at 11-46 to -47. That language remained in the 2011, 2014, 2017, and 2019 versions of the IAPP. 2011 IAPP at 47-48; 2014 IAPP at 42; 2017 IAPP at 42; 2019 IAPP at § 9.6.2.

The IAPP also required law enforcement agencies to prepare an annual report for the public that summarized types of complaints against officers and their outcomes but did not include officers' names. 2000 IAPP at 11-48; 2011 IAPP at 50; 2014 IAPP at 44; 2017 IAPP at 44; 2019 IAPP at § 9.11.1. The annual report could be "statistical in nature." 2011 IAPP at 50; 2014 IAPP at 44; 2017 IAPP at 44; 2019 IAPP at § 9.11.1. Starting with the 2019 IAPP, public reports had to be posted on websites of law enforcement agencies. 2019 IAPP at § 9.11.1.

In 2001, the Legislature likewise mandated the Superintendent of the State Police to submit an annual report of complaints of misconduct against members of the State Police, with the number of complaints and the results for each category. N.J.S.A. 53:1-10.1. The statistical report "shall not disclose personal identifiers" of any officers or complainants. Ibid.

Directives 2020-5 and 2020-6 altered those historical practices. As noted earlier, the Directives require that officers subject to major discipline be identified publicly.

22

The current IAPP still requires each law enforcement agency to publish on its public website, on an annual basis, a statistical report "summarizing the types of complaints received and the dispositions of those complaints." Directive 2020-5 at 3-4 (amending 2019 IAPP § 9.11.1). But for complaints in which an officer was terminated, received a reduction in rank or grade, or was suspended for more than five days, Directive 2020-5 requires that the identity of the officer be revealed, along with a brief summary of the offense and the sanction imposed. Id. at 4 (amending 2019 IAPP § 9.11.2).

The Directive distinguishes between "minor discipline" of up to five days' suspension and "major discipline." Id. at 3. "Major disciplinary violations can include conduct involving, among other things, excessive force against civilians, racially derogatory comments, driving while intoxicated, domestic violence, theft, the filing of false reports, and/or conduct that results in criminal charges against the officer." Ibid.

Directive 2020-5, issued on June 15, 2020, requires agencies to publish their first report no later than December 31, 2020, for discipline finalized during the preceding twelve months. Id. at 3-4. The Directive thus applies not only prospectively but also for at least five months before it was issued. In addition, Directive 2020-5 states that "nothing . . . prevents agencies from

23

releasing similar information regarding historical incidents of officer misconduct." Id. at 3.

The changes to the IAPP outlined above apply prospectively to officers in the New Jersey State Police, the Division of Criminal Justice, and the Juvenile Justice Commission, as well as local law enforcement officials. Directive 2020-6, issued on June 19, 2020, additionally requires the three state agencies to "publish the names of any officers who have been subject to serious discipline in the past twenty years." Directive 2020-6 at 1. The Attorney General directed the three agencies to publish, no later than July 15, 2020, the names of law enforcement officers subject to major discipline since January 1, 2000. Id. at 2. According to the Directive, each division must provide at least seven days' notice to each officer, "whenever possible," and "make reasonable efforts to contact" former "officer[s] at their last known residential address, email address, or phone number." Ibid.

Directive 2020-6 notes that it is a final agency action under Rule 2:2-3(a)(2). Id. at 3.

B.

Appellants claim the Directives violate OPRA, N.J.A.C. 13:1E-3.2, and Executive Order 11 (Byrne). According to appellants, those authorities protect

24

the confidentiality of personnel records in a way that bars the key changes to the IAPP. We do not agree.

OPRA is designed to give the public ready access to government records. The law seeks to promote transparency in government and avoid "the evils inherent in a secluded process." Brennan v. Bergen Cnty. Prosecutor's Off., 233 N.J. 330, 343 (2018) (quoting Mason v. City of Hoboken, 196 N.J. 51, 64 (2008)). OPRA's drafters understood "that without access to information contained in records maintained by public agencies citizens cannot monitor the operation of our government or hold public officials accountable for their actions." Fair Share Hous. Ctr., Inc. v. State League of Municipalities, 207 N.J. 489, 502 (2011).

Under the statute, government records are subject to disclosure unless the law exempts them from access. N.J.S.A. 47:1A-1. As the Appellate Division aptly noted, however, "this is not an OPRA case." In re Att'y Gen. Directives, 465 N.J. Super. at 139. Appellants are not asking for records to be disclosed; they seek the opposite.

Appellants highlight section 10 of the law, which limits the disclosure of personnel and pension records. See N.J.S.A. 47:1A-10 ("[T]he personnel or pension records of any individual in the possession of a public agency . . . shall not be considered a government record and shall not be made available for

public access . . . .").  Appellants contend the provision is an express statement of legislative policy in favor of confidentiality.  Section 10, however, contains an important exception:  "[P]ersonnel or pension records . . . shall be accessible <u>when required to be disclosed by another law</u> . . . ."  <u>Ibid.</u> (emphasis added).

N.J.A.C. 13:1E-3.2(a), a regulation the Department adopted in 2014, similarly ties back to section 10.  The regulation provides that certain records "shall not be considered government records subject to public access" under OPRA.  N.J.A.C. 13:1E-3.2(a).  Among other categories of exempt items, the regulation lists records about individual employees "relating to or which form the basis of discipline."  <u>Id.</u> at (a)(4).  But this regulation contains a critical exception as well.  It does not apply to "records enumerated in N.J.S.A. 47:1A-10 as available for public access."  <u>Id.</u> at (a)(4).  In other words, a record subject to disclosure under section 10 of OPRA is likewise subject to disclosure under the regulation.

The same exception is embedded in Executive Order 11, issued by Governor Byrne.  The order provides, in part, that "<u>[e]xcept as otherwise provided by law</u> . . . an instrumentality of government shall not disclose . . . personnel or pension records of an individual."  <u>Exec. Order No. 11</u> (November 15, 1974), 1 <u>Laws of New Jersey 1974</u> 765 (emphasis added).

26

As noted earlier, the Legislature expressly gave the Attorney General responsibility over "the general supervision of criminal justice . . . as chief law enforcement officer of the State," N.J.S.A. 52:17B-98, and directed the Attorney General to "[f]ormulate and adopt rules and regulations" to administer the Department, N.J.S.A. 52:17B-4(d). Based on that authority, Attorneys General have issued various directives that govern the disciplinary process.

As the Court has recognized on prior occasions, Attorney General directives relating to the administration of law enforcement have the "force of law." See N. Jersey Media Grp., Inc. v. Township of Lyndhurst, 229 N.J. 541, 565 (2017) (concluding that the Attorney General's Use of Force Policy has "the force of law for police entities" (quoting O'Shea v. Township of West Milford, 410 N.J. Super. 371, 382 (App. Div. 2009))); Paff v. Ocean Cnty. Prosecutor's Off., 235 N.J. 1, 20-21 (2018) (finding that a local police chief's general order does not carry the force of law, unlike guidelines, directives, and policies issued by the Attorney General). The IAPP, in particular, carries the force of law for State and local law enforcement. Fraternal Ord. of Police, Newark Lodge No. 12 v. City of Newark, 244 N.J. 75, 100-01 (2020).

Appellants contend that although the Attorney General has the power to issue directives, they are not "laws" passed by the Legislature, and therefore

27

do not trigger the exceptions in the above three sources. But even if we accept that argument, the Legislature enacted a separate statute that underscores the force of the IAPP. N.J.S.A. 40A:14-181 embraces the Attorney General's policy on internal affairs matters by directing law enforcement agencies throughout the state to adopt guidelines consistent with the IAPP. See Fraternal Ord. of Police, 244 N.J. at 101 ("Section 181 effectively made the AG's IAPP required policy for all municipal law enforcement agencies in New Jersey."). And the policy in effect at the time section 181 was enacted declared that police executives, like the Attorney General, could release disciplinary records. See 1992 IAPP ("Only the police executive or his designee is empowered to release publicly the dispositions of an internal investigation or disciplinary action.").

The Directives therefore do not conflict with OPRA, N.J.A.C. 13:1E-3.2(a), or Executive Order 11. They are binding policy measures that provide a basis in law for the release of the names of officers who have been subjected to major discipline.[1]

---

[1] N.J.S.A. 53:1-10.1, which appellants reference, has no bearing on the Attorney General's authority to issue the Directives. The statute is discussed in section III.A above.

IV.

Appellants also argue that the Directives are arbitrary, capricious, and unreasonable and, therefore, cannot be upheld. The Attorney General acknowledges the Directives are final agency action and contends that appellants have not overcome the substantial deference owed the Department.

A.

Judicial review of actions by administrative agencies is provided for under the State Constitution. N.J. Const. art. VI, § 5, ¶ 4; see In re Proposed Quest Acad. Charter Sch. of Montclair Founders Grp., 216 N.J. 370, 383 (2013); see also R. 2:2-3(a)(2) (providing for review of final agency decisions or actions in the Appellate Division).

Courts apply a deferential standard to final agency actions and will not overturn them unless an action is arbitrary, capricious, or unreasonable. In re Yucht, 233 N.J. at 279. The burden to make that showing "rests upon the [party] challenging the administrative action." Lavezzi v. State, 219 N.J. 163, 171 (2014) (alteration in original) (quoting In re J.S., 431 N.J. Super. 321, 329 (App. Div. 2013)).

The deferential standard is consistent with "the strong presumption of reasonableness that an appellate court must accord an administrative agency's exercise of statutorily delegated responsibility." City of Newark v. Nat. Res.

29

Council, Dep't of Env't Prot., 82 N.J. 530, 539 (1980); accord Lavezzi, 219 N.J. at 171. The standard also recognizes the "agency's expertise and superior knowledge of a particular field," In re Carter, 191 N.J. 474, 483 (2007) (quoting Greenwood v. State Police Training Ctr., 127 N.J. 500, 513 (1992)), as well as the Judiciary's "limited role . . . in reviewing the actions of other branches of government," In re Musick, 143 N.J. 206, 216 (1996).

In applying the standard, courts do not consider what they might have done in the agency's place or substitute their judgment for the agency's. See Greenwood, 127 N.J. at 513. Courts instead typically consider three things:

> (1) whether the agency's action violates express or implied legislative policies, that is, did the agency follow the law; (2) whether the record contains substantial evidence to support the findings on which the agency based its action; and (3) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.
>
> [In re Quest Acad., 216 N.J. at 385 (quoting Mazza v. Bd. of Trs., PFRS, 143 N.J. 22, 25 (1995)).]

Although the three-part inquiry applies generally to all administrative agency actions, see id. at 386, it is not a rigid standard. Its application necessarily adjusts to accommodate the kind of agency action in question. See generally Pressler & Verniero, Current N.J. Court Rules, cmts. 7.1 & 8.1 on R. 2:10-2 (2021).

30

Most administrative agencies perform two delegated functions: they have the power to make rules that can have the effect of laws -- a quasi-legislative role -- and the power to adjudicate individual cases -- a quasi-judicial role. See Jacob A. Stein et al., 4 Administrative Law § 14.01 (2021); accord Nw. Covenant Med. Ctr. v. Fishman, 167 N.J. 123, 135 (2001); see also In re Quest Acad., 216 N.J. at 386 (citing examples); Jeffrey S. Mandel, N.J. Appellate Practice, 38:1-2 (2021) (distinguishing types of administrative action). "The line between the[] two functions," however, "is not always a clear one." NLRB v. Wyman-Gordon Co., 394 U.S. 759, 770 (1969) (Black, J., concurring); accord Metromedia, Inc. v. Dir., Div. of Tax'n, 97 N.J. 313, 332 (1984); Carls v. Civ. Serv. Comm'n of N.J., 17 N.J. 215, 220 (1955). Agencies can also act in a hybrid manner, with features of rulemaking and adjudication, or in an informal fashion, without a hearing. Nw. Covenant Med. Ctr., 167 N.J. at 136-37.

The nature of an administrative action affects how the standard of appellate review is applied. See Pressler & Verniero, cmts. 7.1 & 8.1 on R. 2:10-2 (collecting cases). For example, the three-part test is a good fit for review of quasi-judicial actions. In those matters, a robust record naturally invites focused attention on the test's second prong -- "whether the record contains substantial evidence to support the findings on which the agency

31

based its action." In re Quest Acad., 216 N.J. at 385 (quoting Mazza, 143 N.J. at 25). But for more policy-driven, quasi-legislative acts, the record may be less extensive. An agency's action must still rest on a reasonable factual basis, but its choice between two supportable, yet distinct, courses of action "will not be deemed arbitrary or capricious as long as it was reached 'honestly and upon due consideration.'" In re Adoption of Amends. & New Regs. at N.J.A.C. 7:27-27.1, 392 N.J. Super. 117, 135-36 (App. Div. 2007) (quoting Worthington v. Fauver, 88 N.J. 183, 204-05 (1982)).

The Directives do not fit easily into the typical categories of agency action. They are not the result of adjudication, so there is no record of a hearing before the Office of Administrative Law. See N.J.S.A. 52:14B-10; N.J.A.C. 1:1-18.6(b), (c). Nor were they adopted under the rulemaking requirements of the APA, N.J.S.A. 52:14B-1 to -15, which allows agencies to give reasons for an action or policy during a notice and comment period, see N.J.S.A. 52:14B-4.

The Directives most closely resemble quasi-legislative action. They apply in a uniform fashion without the need for individualized determinations. When an executive branch official acts in a quasi-legislative manner, the arbitrary and capricious "standard does demand that the reasons for the decision be discernible, [but they] need not be as detailed or formalized as an

32

agency adjudication of disputed facts." In re Englewood on Palisades Charter Sch., 320 N.J. Super. 174, 217 (App. Div. 1999), aff'd as modified, 164 N.J. 316 (2000); accord In re Red Bank Charter Sch., 367 N.J. Super. 462, 476 (App. Div. 2004); Bd. of Educ. of E. Windsor Reg'l Sch. Dist. v. State Bd. of Educ., 172 N.J. Super. 547, 552 (App. Div. 1980).

More generally, the appellate standard in such matters focuses on whether the agency's decision is consistent with its delegated authority. Judicial intervention is limited to "those rare circumstances in which it is clear that the agency action is inconsistent with its mandate." In re Petition for Rulemaking, 117 N.J. 311, 325 (1989).

The Legislature empowered the Attorney General to issue directives. To determine whether a particular directive is arbitrary, capricious, or unreasonable, courts consider whether "there is any fair argument in support of the course taken or any reasonable ground for difference of opinion among intelligent and conscientious officials." Flanagan v. Dep't of Civ. Serv., 29 N.J. 1, 12 (1959). "Put another way, is the rule unreasonable or irrational?" Bergen Pines Hosp. v. Dep't of Human Servs., 96 N.J. 456, 477 (1984). To answer that question, we turn to the Directives themselves.

33

B.

The Directives detail the Attorney General's justification for releasing the names of officers subject to major discipline. Because the rationale underlying the Directives is critical to this appeal, we quote from them at length.

Directive 2020-5 is addressed to all law enforcement chiefs. At the outset, it acknowledges "good reasons why internal affairs records are not generally disclosed," namely, "the need to protect those who report and witness police misconduct," and the fact that a number of complaints "are ultimately determined to be unsubstantiated or unfounded." Directive 2020-5 at 1.

The Attorney General, however, also emphasizes that

> [l]aw enforcement officers are entrusted with extraordinary responsibility and it is imperative that all officers maintain the highest standards of good discipline and conduct. Therefore, when a law enforcement agency concludes that one of its members has violated agency rules in a way that warrants professional sanction, there is a stronger rationale for public disclosure. And the more significant the violation, the more important it is that the public know about the misconduct.
>
> [Id. at 1-2.]

34

After briefly reviewing recent changes to the IAPP, Directive 2020-5 continues:

> More is required to promote trust, transparency and accountability, and I have concluded that it is in the public's interest to reveal the identities of New Jersey law enforcement officers sanctioned for serious disciplinary violations. Our state's law enforcement agencies cannot carry out their important public safety responsibilities without the confidence of the people they serve. The public's trust depends on maintaining confidence that police officers serve their communities with dignity and respect. In the uncommon instance when officers fall well short of those expectations, the public has a right to know that an infraction occurred, and that the underlying issue was corrected before that officer potentially returned to duty.
>
> [Id. at 2.]

Directive 2020-5 next observes that "[t]he vast majority of law enforcement officers . . . serve with honor and . . . courage . . .[, b]ut their good work is easily undermined . . . whenever an officer breaches the public's trust." Ibid. Underscoring the importance of deterrence, the Directive adds the following:

> The likelihood of such misbehavior increases when officers believe they can act with impunity; it decreases when officers know that their misconduct will be subject to public scrutiny and not protected. The deterrent effect of this scrutiny will, in the end, improve the culture of accountability among New Jersey law enforcement.

35

[Ibid.]

As noted before, Directive 2020-6 is addressed to three entities in the Department -- the State Police, Division of Criminal Justice, and Juvenile Justice Commission. The Directive adopts the above reasons and explains that "[s]haring the identities of individuals who received major discipline will allow for public scrutiny and improve the culture of accountability among the Department's law enforcement agencies." Directive 2020-6 at 1.

Directive 2020-6 also addresses the reason the new policy extends to former employees:

> [M]any of our officers go on to serve with other law enforcement agencies, and the State at present lacks a licensing system to track such repeat disciplinary sanctions across agencies. Moreover, the sharing of identities will enable the public and policymakers to identify repeat offenders, and to hold the Department's law enforcement agencies accountable for their response to patterns of discipline. And, most importantly, the sharing of identities will help to build public confidence in the vast majority of officers . . . [and] will help to build significant trust between [the] officers and the communities they serve.
>
> [Id. at 2.]

The Attorney General highlighted a number of the same concerns at oral argument. Among others, he emphasized that releasing the names of officers

36

subject to major discipline will enable the public to monitor the internal affairs process and gauge, for example, if progressive discipline worked effectively or if officers were promoted after repeated episodes of serious misconduct. In addition, the Attorney General stressed why it is important to reveal prior instances of serious misconduct by former or retired officers. If they seek employment with other law enforcement agencies, their internal affairs files are available for review under the IAPP. See 2020 IAPP §§ 3.1.1, 3.1.2. That is not the case, though, for officers looking to move to a sensitive, quasi-law-enforcement position, like a security post in a public school or hospital, or a similar position in the private sector. The public likewise would not have access to the information.

To be sure, the parties strongly disagree about the wisdom and consequences of the Directives, and appellants offer a very different perspective. They contend the Directives will embarrass officers and make them and their families targets for retribution; undermine the integrity of the investigatory process; chill cooperation from officers; discourage officers from seeking treatment for alcohol or drug dependencies; undermine the command structure in law enforcement agencies; have a negative effect on public safety; and reveal the identities of victims and witnesses in domestic violence and other matters. Appellants also believe the Attorney General's rationale is

37

flawed in that the new Directives will not achieve accountability and will add nothing to a process that is already adequate. In addition, they contend the Attorney General's focus on what penalties are assessed, rather than on the type of misconduct committed, renders the Directives over-inclusive and arbitrary.[2, 3]

Disagreement over a policy, however, does not make it arbitrary, capricious, or unreasonable. If an administrative action is consistent with legislative policies, rests on a reasonable basis, reflects careful consideration

---

[2] "An employee may be subject to [major] discipline for: (1) Incompetency, inefficiency or failure to perform duties; (2) Insubordination; (3) Inability to perform duties; (4) Chronic or excessive absenteeism or lateness; (5) Conviction of a crime; (6) Conduct unbecoming a public employee; (7) Neglect of duty; (8) Misuse of public property, including motor vehicles; (9) Discrimination that affects equal employment opportunity (as defined in N.J.A.C. 4A:7-1.1), including sexual harassment; (10) Violation of Federal regulations concerning drug and alcohol use by and testing of employees who perform functions related to the operation of commercial motor vehicles, and State and local policies issued thereunder; (11) Violation of New Jersey residency requirements . . . ; and (12) Other sufficient cause." N.J.A.C. 4A:2-2.3; see also N.J.A.C. 4A:2-3.1(c). Under the Administrative Code, "major discipline" includes "[r]emoval, [d]isciplinary demotion, and [s]uspension or fine for more than five working days at any one time." N.J.A.C. 4A:2-2.2(a).

The Attorney General notes that disclosure of incidents resulting in major discipline tracks lines drawn by the Civil Service Commission and avoids "subjective or vague determinations" about "the kind of misconduct that the public deserves to know about."

[3] Amicus Chiefs of Police also submits that the retroactive nature of the Directives makes them arbitrary and fundamentally unfair. We consider the issue of retroactivity separately below.

of the issues, and can otherwise satisfy the standard for appellate scrutiny, the policy should be upheld.  See In re Adoption of Amends., 392 N.J. Super. at 135-36.  Here, the Attorney General exercised authority the Legislature placed in his office to develop and revise disciplinary policies.  He acted to enhance public trust and confidence in law enforcement, to deter misconduct, to improve transparency and accountability in the internal affairs process, and to prevent officers from evading the consequences of their misconduct.  The Attorney General's reasoned bases for acting were fully consistent with the Department's mandate.  See In re Petition for Rulemaking, 117 N.J. at 325.

The Directives implement a practice that is common in other professions.  When doctors, lawyers, judges, and other professionals are disciplined for misconduct, their names are made public.  See, e.g., N.J.S.A. 45:9-22.22(a), -22.23(7) to (8) (physicians, podiatrists, and optometrists); R. 1:20-9(m) (attorneys); R. 2:15-15(a), -20(b) (judges).  The New Jersey Division of Consumer Affairs lists the results of disciplinary actions against accountants, architects, dentists, electrical contractors, engineers, nurses, pharmacists, plumbers, real estate appraisers, and others on its website.  See Division of Consumer Affairs, https://www.njconsumeraffairs.gov/ (last visited June 1, 2021) (select "Boards and Committees," then choose the applicable profession and select "Actions (Disciplinary and Other)").

Once again, thoughtful concerns in opposition to a new policy are not fatal to administrative action. The Attorney General's decision to release the names of law enforcement officers subject to major discipline is consistent with his delegated authority and grounded in reason. It is not arbitrary, capricious, or unreasonable.

V.

To the extent appellants continue to advance an ex post facto claim, we agree with the Appellate Division that the release of officers' names from matters resolved before the Directives were issued does not violate the Ex Post Facto Clause. In re Att'y Gen. Directives, 465 N.J. Super. at 149-52.

"The Ex Post Facto Clause is 'aimed at laws that "retroactively alter the definition of crimes or increase the punishment for criminal acts."'" State v. Perez, 220 N.J. 423, 438 (2015) (quoting Cal. Dep't of Corr. v. Morales, 514 U.S. 499, 504 (1995)); see State v. Hester, 233 N.J. 381, 392 (2018). The Directives do none of those things. Nor do they reflect a change in the law. See State v. Purnell, 161 N.J. 44, 53 (1999) (noting that for retroactivity purposes, "the threshold inquiry [is] whether the rule at issue is a 'new rule of law'" (alteration in original) (quoting State v. Afanador, 151 N.J. 41, 57 (1997))). In addition, a departmental rule or regulation that is civil and non-

punitive is not subject to the Ex Post Facto Clause. See Riley v. State Parole Bd., 219 N.J. 270, 292-93 (2014).

The Attorney General's authority is grounded in statutes enacted decades ago. See N.J.S.A. 52:17B-4 (enacted in 1948); N.J.S.A. 52:17B-98 (enacted in 1970). And as discussed above in section III.A, the Attorney General has advised officers for more than twenty years that their internal affairs records might be released.

Insofar as appellants challenge the manner in which the Attorney General exercised his discretionary authority to change longstanding practice, their claim emphasizes estoppel principles, to which we turn next.

VI.

Appellants argue that the Directives violate the doctrine of promissory estoppel. There are four elements to a claim under the doctrine: "(1) a clear and definite promise; (2) made with the expectation that the promisee will rely on it; (3) reasonable reliance; and (4) definite and substantial detriment." Goldfarb v. Solimine, 245 N.J. 326, 339-40 (2021) (quoting Toll Bros., Inc. v. Bd. of Chosen Freeholders of Burlington, 194 N.J. 223, 253 (2008)).

Promissory estoppel is an equitable doctrine that has its roots in contract law but is distinct from a typical claim to enforce a contract. Goldfarb, 245 N.J. at

41

340-41, 341 n.6. In that regard, we note that N.J.S.A. 40A:14-181 expressly provides that IAPPs "shall not supersede any existing contractual agreements."

Appellants also rely on the related theory of equitable estoppel, which requires a showing of "a knowing and intentional misrepresentation by the party sought to be estopped under circumstances in which the misrepresentation would probably induce reliance, and reliance by the party seeking estoppel to his or her detriment." In re Johnson, 215 N.J. 366, 379 (2013) (quoting O'Malley v. Dep't of Energy, 109 N.J. 309, 317 (1987)); see also Williston on Contracts § 8:3 (Lord ed. 2008).

Principles of estoppel must be evaluated with care when a party seeks to apply them against the government. See In re Johnson, 215 N.J. at 378 ("Equitable estoppel is rarely invoked against a governmental entity, particularly when estoppel would 'interfere with essential governmental functions.'" (citations omitted) (quoting O'Malley, 109 N.J. at 316)); Harmon v. Del. Harness Racing Comm'n, 62 A.3d 1198, 1200-01 (Del. 2013) (noting that "as a general rule," in the context of promissory estoppel claims, "the 'state is not estopped in the exercise of its governmental functions by the acts of its officers'" (quoting McCoy v. State, 277 A.2d 675, 676 (Del. 1971))).

## A.

Appellants submitted multiple certifications in support of their claim in order to demonstrate that the Office of the Attorney General made clear promises of confidentiality throughout the disciplinary process. The Appellate Division observed that appellants pursued only a facial challenge to the Directives. In re Att'y Gen. Directives, 465 N.J. Super. at 153-54. The court also properly found it could not resolve estoppel claims on the existing record. Id. at 153. Instead, the Appellate Division noted that individual officers could pursue as-applied challenges within fourteen days of getting notice. Id. at 154-55. The Attorney General asks the Court to provide guidance for those potential challenges.

Although the record is incomplete, it raises significant concerns in that it suggests that officers who agreed to major discipline received assurances of confidentiality. The Attorney General points out that since 2000, the IAPPs have stated the Attorney General and County Prosecutor could release the names of officers who had been disciplined, and that law enforcement executives could authorize access to internal affairs files "for good cause." See 2000 IAPP at 11-46; 2011 IAPP at 47; 2014 IAPP at 42; 2017 IAPP at 42; 2019 IAPP at § 9.6.2. The historical practice, however, is not so clear.

Each IAPP stresses that records of internal affairs investigations are confidential and that files must be "clearly marked as confidential." 1991 IAPP at 15; 1992 IAPP; 2000 IAPP at 11-46; 2011 IAPP at 47; 2014 IAPP at 42; 2017 IAPP at 42; 2019 IAPP at § 9.6.1. In addition, a series of certifications in the record from the Superintendent of the State Police and others assert that for many years, the internal affairs process has been replete with promises of confidentiality and reassurances from state officials to officers who agreed to discipline.

Former Superintendent Joseph R. Fuentes submitted a certification in which he explained that he was personally involved in disciplinary matters during his tenure and had the ultimate responsibility to approve final settlements and set penalties for State Troopers in disciplinary matters. Fuentes Certif., Aug. 4, 2020, ¶ 26. He also had statutory responsibilities relating to the disciplinary process. Pursuant to N.J.S.A. 53:1-10, "[t]he superintendent shall, with the approval of the governor, make all rules and regulations for the discipline and control of the state police."

Among other statements, the Superintendent certified to the following:

> * "State Troopers were ordinarily extended a promise that such disciplinary matters would remain confidential and that their names and identities would not be released to the public." Fuentes Certif., ¶ 27 (emphases added).

44

* "The office of the State Attorney General is not just an observer of this process; rather [it is] an integral part in constructing, reviewing and approving confidentiality agreements in matters of General Discipline (subject to 30 or more days of suspension) . . . ." Ibid.

* "I personally provided the assurance of confidentiality to many State Troopers under my command . . . ." Id. ¶ 28 (emphasis added).

* "During my tenure with the State Police internal affair[s] files were always maintained as confidential and privileged documents." Id. ¶ 32.

* "State Troopers who were involved in an internal affairs investigation were advised that the process was confidential." Id. ¶ 58.

* "State Troopers who resolved disciplinary matters were advised that any settlements of disciplinary matters or plea agreements would remain confidential and that their identities would not be disclosed." Id. ¶ 60 (emphasis added).

* "In exchange for accepting a settlement a Trooper was promised confidentiality and a promise was also extended that it would not stand as a shaming incident for the remainder of his career." Id. ¶ 69 (emphasis added).

Trooper Wayne D. Blanchard, President of the State Troopers Fraternal Association of New Jersey, certified as follows:

45

* "During the disciplinary process, . . . [t]he Trooper and the NJSP can enter a Voluntary Negotiated Plea Agreement and the Trooper is advised that it will remain strictly confidential and recorded in the member's Discipline File and would not be released to the public."  Blanchard Certif., Aug. 5, 2020, ¶ 9.

* "It is explained very clearly that if the matter is not adjudicated within the NJSP, the matter would be transmitted to the Office of Administrative Law for a hearing, if applicable, and from that point forward the matter is made public."  Ibid.

* "<u>The guarantee of confidentiality has caused many Troopers to enter into settlement agreements with the NJSP.</u>"  Id. ¶ 10 (emphasis added).

Detective Sergeant Pete J. Stilianessis, president of the State Troopers Non-Commissioned Officers Association, also submitted a certification.  He stated in broad terms as follows:

> * "Every disciplinary action assessed against State Troopers was premised upon express representations of confidentiality and privilege."  Stilianessis Certif., ¶ 36.
>
> * "This express representation was formally extended to union representatives, individual troopers and their attorneys."  Id. ¶ 37.
>
> * "Confidentiality was assured and promised at every stage of the disciplinary process."  Id. ¶ 38.
>
> * "Command staff within the Division of State Police directly informed Troopers union representatives and

46

attorneys engaged within the disciplinary process, that the entire matter would be deemed privileged and confidential and would never be released to the public." Id. ¶ 39.

Stilianessis also quoted an anonymous trooper who certified that "[d]uring the entrance of the negotiated settlement agreement, I was assured that this matter was confidential and that it would not define my career." Id. ¶ 69. Another anonymous trooper made a similar statement. Id. ¶ 70.

In addition, Stilianessis noted that, as recently as 2019, the Attorney General argued before the Appellate Division against the release of the name of any State Trooper linked to a disciplinary charge. See id. ¶ 42. In a brief to the Appellate Division in Libertarians for Transparent Government v. New Jersey State Police, a case that involved an OPRA request, the Attorney General argued that law enforcement officers are "entitled to . . . [a] reasonable expectation of privacy" in their disciplinary history. Att'y Gen. Br., Aug. 6, 2018, at 2; cf. 243 N.J. 515 (2020) (dismissing the appeal upon stipulation of the parties). The Attorney General also argued that "[t]he confidentiality interest supporting non-disclosure of information relating to internal and criminal investigations of State Police members is significant." Id. at 7-8.

The Attorney General's brief in <u>Libertarians</u> appears to validate part of the certifications before the Court in this case. In particular, the office's written submission concedes

> [i]t is often the case that the subject of an internal affairs investigation agrees to accept culpability of some, or all of the charges brought against him or her and waives his or her right to formal administrative proceedings on the charges. <u>By choosing to resolve the matter, and not bring the matter to a public forum, [the Trooper's] identity is protected from public disclosure. Not only does this fact undoubtedly incentivize some troopers to agree to cooperate</u>, but it also benefits the investigating unit by not having to expend as many resources to conclude an investigation yet still bring a favorable outcome.
>
> [<u>Id.</u> at 9-10 (emphasis added).]

The trial court in <u>Libertarians</u> accepted the State's argument and declined to order disclosure of the Trooper's identity. After oral argument in 2019, the Appellate Division affirmed for substantially the same reasons.[4]

The Attorney General oversees the Department of Law and Public Safety, of which the State Police is a part. He has the ultimate authority to set policy for the Department and can decide to change direction on matters of policy. Although stated positions of the Attorney General may not necessarily

---

[4] We refer to the proceedings because they offer relevant context; we do not suggest the rulings are precedential. <u>See</u> <u>R.</u> 1:36-3.

amount to clear and definite promises, see Goldfarb, 245 N.J. at 340, it is understandable for appellants to highlight prior public comments that support their position as they advance equitable claims.

In a related argument, appellants remind the Court that government agencies must "turn square corners" in their dealings with others. See W.V. Pangborne & Co., Inc. v. Dep't of Transp., 116 N.J. 543, 561-62 (1989). We do not find the Directives violated that standard. They reflect the considered judgment of the Attorney General about public accountability of law enforcement officers. At the same time, we recognize that an agency's recent formal statements can have a bearing on the equitable arguments appellants raise.

Among other reasons, the Attorney General contends that appellants' estoppel argument should fail because disciplinary records are disclosed in criminal cases to satisfy the requirements of Brady v. Maryland, 373 U.S. 83 (1963), and United States v. Giglio, 405 U.S. 150 (1972), and to respond to civil discovery requests. But no promise of confidentiality could attach to those affirmative legal obligations. In addition, those disclosures arise in a rather different context. Discovery materials disclosed in those settings are not made to the public and can be subject to a protective order or some other form of oversight by the court. In contrast, the Directives require or invite the

49

posting of twenty years of major disciplinary findings, with officers' names attached, on a public website.

B.

We cannot probe the certifications in the record or resolve appellants' equitable claims.[5] We also recognize that information contained in the certifications might be relevant to hundreds of potential individual challenges. See Fuentes Certif., ¶ 16 (estimating there are nearly 500 cases involving major discipline with the State Police that date back twenty years). To help ensure that relevant issues are resolved in a uniform and efficient manner, we exercise our supervisory authority to establish the following process. See N.J. Const. art. VI, § 2, ¶ 3.

A single Judge of the Superior Court will be designated to conduct a broad-ranging evidentiary hearing. The hearing should explore the practice of the State Police relating to disciplinary matters, and the question of confidentiality, in particular, before the Directives were issued. All parties and amici shall receive notice of the hearing and have the opportunity to

---

[5] To be clear, estoppel claims can be raised only by officers who settled their disciplinary actions. Officers who contested accusations against them in the course of a public hearing cannot claim they relied on a promise of confidentiality. At oral argument, appellants estimated that ninety percent of disciplinary cases are resolved through settlement agreements.

50

participate.  Both sides may present witnesses and documentary evidence; they may also probe the role of counsel from the Department of Law and Public Safety.

The judge shall make appropriate findings.  If there is sufficient credible evidence, the court, in its discretion, may resolve the issue of confidentiality on a broad scale.  In other words, if the court finds that promises of confidentiality were made and relied on consistent with the appropriate legal standards, see Goldfarb, 245 N.J. at 339-40; In re Johnson, 215 N.J. at 378, it could bar the release of names of law enforcement officers subject to Directive 2020-6 for disciplinary matters settled before June 19, 2020.  If the record does not support such a conclusion for the entire group of officers, the court's more limited findings may be incorporated and made part of the record in individual challenges that will likely follow.[6]

Depending on the outcome of the above hearing, State Troopers and law enforcement officers in the Division of Criminal Justice and the Juvenile Justice Commission ("Troopers") are to file any as-applied challenges afterward in the Superior Court in the nature of actions in lieu of prerogative writs.  See R. 4:69.  The Attorney General shall first provide current and

---

[6] We do not retain jurisdiction.  The outcome of the hearing is subject to the ordinary rules of appellate procedure.

51

retired Troopers notice of the proposed disclosure by personal service, in the manner required by Rules 4:4-3(a), -4(a)(1), and -4(b)(1).[7] Current or retired Troopers, in turn, are to file any actions within 45 days of receiving such notice. R. 4:69-6(a). The additional time beyond 14 days, see In re Att'y Gen. Directives, 465 N.J. Super. at 154-55, will enable Troopers to contact and retain counsel, and interact with the Department before deciding whether to proceed to court. Troopers' names shall not be released during the 45-day period.

As part of the notice, the Attorney General shall identify a point of contact in the Department from whom Troopers may seek additional information. See id. at 155. The Attorney General has agreed to do so. At oral argument, the Attorney General also represented that the office would disclose relevant disciplinary files to Troopers on request. It is incumbent on Troopers to ask for their files in a timely manner; the files should be disclosed within two weeks of a request.

In addition, the Attorney General represents that "no synopsis of discipline will include the name of any victim, nor will it identify them by

---

[7] The Attorney General represents that his office has already given notice to individuals affected by Directive 2020-6. It is unclear what type of notice was provided.

52

relationship to the offender (e.g., ex-spouse or child)." Like the Appellate Division, we urge the Attorney General to take further steps to protect the identity of victims of domestic violence, including extra redactions and advance notice to victims in appropriate cases. See id. at 155 n.6. We also accept the Attorney General's representation that no synopsis will be published for Troopers known to be deceased.

The trial court shall employ specialized case management to expedite the proceedings. See R. 4:69-4. Until a challenge is resolved by the trial court, and subject to any stays entered pending appeal, the challenger's identity shall not be released. To that end, cases may be filed with fictitious names in the caption, and courts may enter appropriate protective orders. As to the merits, the challengers have the burden to prove why they should prevail.

We do not separately address potential challenges that may arise if or when local chief law enforcement executives decide to release names of officers involved in historical incidents of misconduct, pursuant to Directive 2020-5. The record contains memos from three County Prosecutors in Bergen, Essex, and Union Counties, and a certification relating to the City of Paterson. They set forth different approaches to publish the names of officers subject to major discipline for certain types of misconduct dating back to 2000 or 2014. The record is not as developed about promises of confidentiality relating to

settlements reached before June 2020. Nor does it address other prosecutors or municipalities.

If parties seek to challenge orders by chief law enforcement executives, pursuant to Directive 2020-5, on estoppel grounds, they may file an application with the Assignment Judge in their respective vicinages. Assignment Judges have the authority to set up a process similar to the one outlined above for State Troopers -- a broad-based evidentiary hearing about an agency's disciplinary practices, followed by individual as-applied challenges, if necessary. The procedures outlined above for as-applied challenges brought by Troopers would apply as well.

C.

The Directives also apply prospectively. For major discipline imposed after the Attorney General issued the Directives, officers can expect that their identities will be released to the public. They may challenge disciplinary findings in the ordinary course. That process can vary based on the agency involved and the jurisdiction in which it operates. Compare N.J.A.C. 4A:2-2.1 to -2.13 (Civil Service jurisdictions), with N.J.S.A. 40A:14-147 to -151 (non-Civil Service jurisdictions).

The framework outlined in section VI.B applies only to historical cases of major discipline, imposed before the Directives were issued, in which officers challenge the release of their names on estoppel grounds.

## VII.

Defendants raise a number of additional arguments. They claim the Directives violate their rights to substantive and procedural due process and equal protection; run afoul of the APA; impair their constitutional right to contract; and violate their constitutional right to collective negotiations. As to those points, we affirm the judgment of the Appellate Division largely for the reasons stated in Judge Accurso's thoughtful opinion. See In re Att'y Gen. Directives, 465 N.J. Super. at 155-61.

## VIII.

For the reasons outlined above, we modify and affirm the judgment of the Appellate Division. In a separate order, we also designate a single Judge of the Superior Court to conduct the broad-based hearing described in section VI.B.


JUSTICES LaVECCHIA, ALBIN, PATTERSON, FERNANDEZ-VINA, SOLOMON, and PIERRE-LOUIS join in CHIEF JUSTICE RABNER's opinion.